UNITED STATES of America, Plaintiff,

v.

Guy MANNARINO, et al., Defendants.

Crim. No. 92–10049–WD.

United States District Court,
D. Massachusetts.

Jan. 11, 1994.

---

8. This motion was filed by these three defendants in lieu of an answer.

William F. Sinnott, Paula DeGiacomo, Asst. U.S. Attys., U.S. Atty.'s Office, Boston, MA, for U.S.

Max D. Stern, Stern & Shapiro, Boston, MA, for defendant Guy C. Mannarino.

John E. Wall, Wall & Shaughnessy, Boston, MA, for defendant Andrew Schena.

George C. McMahon, North Quincy, MA, for defendant Anthony J. Damore.

## MEMORANDUM AND ORDERS

WOODLOCK, District Judge.

Misconduct by the state police officer delegated with debriefing and supervising the federal government's principal witness in this case resulted in the destruction of a narrative history of criminal activity the witness had prepared. The defendants have made several alternative requests for relief from this misconduct. Their requests require that I determine whether the witness's handwritten narrative history was Jencks Act material. I find that it was. Having made that finding, I must calibrate a remedy. I do so in a setting which presents yet again a pattern of sustained and obdurate indifference to, and unpoliced subdelegation of, disclosure responsibilities by the United States Attorneys Office in this District. I will order a new trial prior to which the defendants will have the opportunity for a pretrial deposition of the government's principal witness and the state police officer who debriefed him and then disposed of the witness's narrative history. Through such a remedy, it may be possible to approximate a reconstruction of what the government through its agents has destroyed.

## I

Guy Mannarino, Anthony Damore, and Andrew Schena were convicted by a jury of violating 21 U.S.C. §§ 846, 841(a)(1), through a conspiracy to possess with the intent to distribute marijuana. During trial, Mannarino moved to dismiss the indictment, or for other appropriate relief, on the basis of the government's violation of the Jencks Act, 18 U.S.C. § 3500. After their conviction, Mannarino and Damore sought continued release pending sentence.[1] Mannarino's counsel maintained that the purported government violation of the Jencks Act provided the necessary exception to the requirements of 18 U.S.C. § 3143(a), which mandates that those convicted of drug felonies shall be detained until execution of sentence unless "the judicial officer finds there is a substantial likelihood that a motion for acquittal or new trial will be granted." 18 U.S.C. § 3143(a)(2)(A)(i).

After an evidentiary hearing, I found that defendants Mannarino and Damore had met their burden of proof under section 3143(a),[2] and were entitled to avoid detention because I was likely to grant relief in the nature of a new trial.[3]

1. I initially declined to release Schena, who had earlier been detained without bail, after he had violated certain conditions of release prior to trial. Schena, however, joined in the motion for relief arising from the alleged Jencks Act violation.

 Based upon his successful response to the prison regimen and the availability of satisfactory terms for his release, I have recently again enlarged Schena pending resolution of this case.

2. Section 3143(a) provides that "[t]he judicial officer shall order that a person who has been found guilty of an offense" in a case including violations of 21 U.S.C. § 841(a)(1), "and is awaiting imposition or execution of sentence be detained unless—(A)(i) the judicial officer finds there is a substantial likelihood that a motion for acquittal or new trial will be granted ... and (B) the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community." In this case, the Assistant United States Attorney agreed with defense counsel that Mannarino and Damore were not likely to flee and did not pose a danger to the community. The motions for release thus turned on whether there was a substantial likelihood a new trial would be granted.

3. I noted at the hearing that the tenor of the First Circuit's holding in *United States v. Bayko*, 774 F.2d 516, 522 (1st Cir.1985) (defining when an appeal "raise[s]" a substantial question of law or

Having made a preliminary ruling that the United States violated the requirements of the Jencks Act,[4] I now turn—with the benefit of further briefing and argument by the parties following the submission of post-trial motions, extended reflection and further illumination from case law generated by the Court of Appeals—to examine more completely the nature of this apparent violation, and to determine what sanction is appropriate as a remedy.

## II

At trial, the prosecution hinged on the testimony of Ronald W. Jacobsen, a paid government informant.[5] The existence and destruction of a statement arguably within the Jencks Act was first revealed during cross-examination of Jacobsen. Jacobsen testified that, some time after his arrest in February, 1991, and after he agreed to cooperate, he had written out his criminal history in longhand, and provided that record to a Maine drug enforcement officer.[6] When Jacobsen composed his narrative, he was al-

fact" under § 3143(b)), was significant to any consideration of release. However, I concluded that section 3143(b)—which defendants urged as providing the proper standard for judgment—was not directly pertinent to my determination of the bail issue at this stage. Section 3143(a), the post-trial but pre-sentence bail provision, requires that I predict a future decision of my own. By contrast, § 3143(b), the post-sentencing and pending-appeal bail provision, requires that I predict action of the appellate court. *See United States v. McAllister*, 974 F.2d 291 (2d Cir.1992) (decisions construing likelihood of reversal standard under section 3143(b) not relevant to judge's prediction of substantial likelihood that his own decision will result in acquittal or new trial under section 3143(a)).

4. Bail Review Hearing Tr., December 18, 1992 at 3–6.

5. Testimony by United States Drug Enforcement Special Agent Michael Cunniff provided the framework for understanding DEA investigation procedures generally and Jacobsen's role as an informant in particular. Cunniff, the overall case agent in the investigation of Mannarino and Damore, explained how Jacobsen was told to proceed in his meetings with the defendants, and how Jacobsen tape recorded those meetings. Trial Tr., December 3, 1992 (morning) at 3–89.

6. Trial Tr., December 7, 1992 at 40–41.

ready a paid informant of the federal government,[7] and consulted frequently, sometimes daily, with Maine law enforcement officers, local police, and agents of the DEA.[8]

Paul Seitz, a Maine officer who served as Jacobsen's monitor in the informant's effort to collect evidence against drug traffickers, received Jacobsen's criminal history narrative, and used it as one basis for a report of his own labelled an "Overview of Confidential Informant" ("Intelligence Debriefing" or "overview").[9] Seitz then shredded Jacobsen's original narrative.[10]

Following Jacobsen's arrest in February, 1991, Seitz reported directly to his State superiors, in assisting Maine law enforcement officials develop various drug prosecutions from information and evidence provided by Jacobsen.[11] Beginning in late February or early March, 1991, however, Seitz was also part of a task force consisting of the Maine Bureau of Intergovernmental Drug Enforcement (initially, the task force's directing arm), the DEA, the FBI, the IRS, and the Customs Service.[12] By July, 1991, Maine's BIDE had ceded control of the task force to the DEA,[13] and while BIDE refused to permit Seitz to be formally assigned to the DEA, the DEA continued to use Seitz to debrief Jacobsen, and to be "in charge of Mr. Jacobsen's overall cooperation." [14]

Seitz conducted the first interviews of Jacobsen, completed just after Jacobsen's arrest,[15] and then continued to interview Jacobsen about his criminal history, the last interview occurring a year and a half later, in October, 1992.[16] Seitz also advised Jacobsen how best to undertake particular informant tasks; and Seitz performed surveillance work with the DEA related to the crimes alleged against Mannarino, Damore, and Schena, taking custody of various pieces of evidence as Jacobsen obtained them.[17]

Seitz's second round of debriefings of Jacobsen began in late April, 1992, and from them Seitz prepared a "Preliminary Debriefing" (dated April, 1992) apparently in response to the defendants' inquiries regarding potential other bad acts evidence the government might seek to introduce.[18] Although this series of meetings began in the spring of 1992, they were held only sporadically until October 1992, when Seitz and Jacobsen met several times a week to complete Seitz's final report, the Intelligence Debriefing.[19] At the December 17, 1992 hearing, Special Agent Cunniff stated that he requested that Seitz conduct follow-up debriefings; and the April, 1992 debriefing was done at the specific request of the United States prosecutorial team.[20] (Jacobsen sent a copy of the April, 1992 debriefing to the Maine DEA office by

**7.** Trial Tr., December 2, 1992 at 76 (Cunniff); December 3, 1992 (afternoon) at 17 (Jacobsen).

**8.** *See, e.g.,* Trial Tr., December 3, 1992 (morning) at 18–19 (Jacobsen); Bail Review Hearing Tr., December 17, 1992 at 69 (Seitz), 110 (Cunniff).

**9.** Bail Hearing Review Tr., December 17, 1992 at 4 (Seitz).

**10.** Jacobsen's narrative may have been written in several parts, each provided to Seitz, and each shredded by him. Trial Tr., December 11, 1992 at 10–11 (Seitz).

**11.** Trial Tr., December 11, 1992 at 3–4 (Seitz).

**12.** Trial Tr., December 11, 1992 at 5 (Seitz); Trial Tr., December 2, 1992 at 5 (Cunniff).

**13.** Trial Tr., December 2, 1992 at 5 (Cunniff).

**14.** Bail Review Hearing Tr., December 17, 1992 at 88 (Cunniff).

**15.** *See, e.g.,* Bail Review Hearing Tr., December 17, 1992 at 15–16 (Seitz); Trial Tr., December 11, 1992 at 4–5 (Seitz). Seitz's initial report, dated February 21–22, 1991, is Exhibit F to Appendix in Support of Defendant's Motion for Judgment of Acquittal.

**16.** *See, e.g.,* Trial Tr., December 11, 1992 at 9–10 (Seitz).

**17.** *See, e.g.,* Trial Tr., December 2, 1992 at 41, 25–26, 68–69 (Cunniff).

**18.** *See, e.g.,* Bail Hearing Review Tr., December 17, 1992 at 8–9 (Seitz); Exhibit G to Appendix in Support of Defendant's Motion for Judgment of Acquittal.

**19.** *See e.g.,* Bail Review Hearing Tr., December 17, 1992 at 12 (Seitz).

**20.** Bail Review Hearing Tr., December 17, 1992 at 100–101.

facsimile transmission on April 21, 1992.)[21] Seitz then conducted his additional debriefings of Jacobsen as he thought necessary, to turn his April, 1992 Preliminary Debriefing into the final Intelligence Debriefing.[22]

The general statutory duty to maintain potential Jencks Act materials in connection with an identifiable criminal prosecution was crystallized in a court order on May 27, 1992, when upon the motion of the defendants Magistrate Judge Collings ordered the government

> to preserve all "statements" as that term is defined in 18 U.S.C. Section 3500 as interpreted in *Goldberg v. United States*, 425 U.S. 94[, 96 S.Ct. 1338, 47 L.Ed.2d 603] (1976) which are within its possession, custody and/or control and which are subject to production at trial in this case pursuant to 18 U.S.C. Section 3500(b).

Seitz had asked Jacobsen to prepare notes of his criminal history from which to prepare a final report; Jacobsen may have turned over such notes to Seitz as early as April, 1992,[23] but by October, 1992, Jacobsen had written a substantial narrative history, which he provided Seitz, and which formed the basis of the Intelligence Debriefing.[24] It was this history, comprised of handwritten notes by Jacobsen, that Seitz destroyed.[25]

### III

In moving that this court dismiss the indictment, declare a mistrial, or strike Jacobsen's testimony, the defendants must show: (A) that Jacobsen's criminal history narrative was a "statement" as defined by the Jencks Act, 18 U.S.C. § 3500(e); (B) that the statement was in the possession of the United States; and (C) that the statement "relates to the subject matter as to which the witness has testified" on direct examination. 18 U.S.C. § 3500(b). If these three requirements are met, the court "shall order" the

statement to be delivered to the defendant. 18 U.S.C. § 3500(b) & (c). If the United States refuses to produce the statement, or has destroyed it, which I conclude can mean, in the language of the statute, that it "elects not to comply" with the court's order, "the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared." 18 U.S.C. § 3500(d).

–A–

At the initial hearing on this matter, the government did not dispute that the defendants met the first requirement of demonstrating Jacobsen's criminal history narrative was a statement. In later briefing, however, the government focused on the definition of "statement" in the Jencks Act, and maintained that Jacobsen's narrative did not comport with it, for it was not, or so the government now claims, "a written statement made by [the] witness and signed or otherwise adopted or approved by him". 18 U.S.C. § 3500(e)(1). The government argues there is no evidence Jacobsen signed his holographic narrative; and his sessions with Seitz were undertaken in an effort to improve and expand the narrative's underlying statement (and, presumably, to remedy its defects, if any), so he should not be deemed to have adopted or approved his own narrative. Government's Memorandum in Opposition to Defendants' Motion for Judgment of Acquittal at 15–24; Government's Reply Memorandum at 1–6. This arid and formalistic argument is frivolous.

■ Courts, in reviewing possible Jencks Act violations, have refined the "adoption" requirement when passing on the destruction of agent notes which contain summaries or supposed quotations, rough or .

---

**21.** Bail Review Hearing Tr., December 17, 1992 at 9 (Seitz); Defendant's Appendix in Support of Motion for Judgment of Acquittal, Exhibit G.

**22.** *See, e.g.,* Bail Review Hearing Tr., December 17, 1992 at 63 (Seitz: "I was trying to build the most complete factual intelligence report that I could"); Exhibit H to Appendix in Support of Defendant's motion for Judgment of Acquittal.

**23.** Bail Review Hearing Tr., December 17, 1992 at 9–12 (Seitz).

**24.** Trial Tr., December 7, 1992 at 40–41 (Jacobsen).

**25.** Bail Review Hearing Tr., December 17, 1992 at 12 (Seitz).

verbatim, from witnesses.[26] When witnesses do not adopt such agent accounts as their own, then those accounts are not statements of the witnesses within the Jencks Act. Here, however, Jacobsen testified at trial that his longhand narrative was "a complete history of everything I had done to the best of my recollection." [27] Jacobsen's personal narrative was thus "approved" by him consistent with the definition of "statement" in the Jencks Act. *Cf. United States v. Butts*, 535 F.Supp. 608, 612 (E.D.Pa.1982) (citing *United States v. Carrasco*, 537 F.2d 372, 375 (9th Cir.1976), ("a government witness' diary turned over to a DEA agent was a Jencks Act 'statement' because a statement, unlike a diary in the hands of its author, 'seeks to transmit information from declarant to the reader' ")).[28]

■ Seitz's Intelligence Debriefing is an inadequate proxy for Jacobsen's narrative. Seitz's overview is an integrated thirty page single-spaced document presented, by design, in the third person. Jacobsen is often referred to by his confidential informant number, although Seitz occasionally lapses into naming Jacobsen,[29] and once, in fact, wanders into the first person (the drug money was slow in coming "to me" [30]). The overview is cloaked in police jargon (Jacobsen travels with his "co-conspirators"; he and his "cohorts were apprehended by law enforcement officials," and so forth).[31] After listening carefully on five separate days to Jacobsen's testimony, I am satisfied the voice of the Seitz Intelligence Debriefing is not the undistorted voice of Jacobsen.

By contrast, Jacobsen's statement, set out in his own words, is precisely the kind of statement Congress through section 3500(e) mandated be provided the defense for purposes of impeaching the witness. In *Palermo v. United States*, 360 U.S. 343, 352, 79 S.Ct. 1217, 1224, 3 L.Ed.2d 1287 (1959), the first case in which the Supreme Court considered the Jencks Act, Mr. Justice Frankfurter stated:

It was important that the statement could fairly be deemed to reflect fully and without distortion what had been said to the government agent. Distortion can be a product of selectivity as well as the conscious or inadvertent infusion of the recorder's opinions or impressions. It is clear from the continuous congressional emphasis on "substantially verbatim recital," and "continuous narrative statements made by the witness recorded verbatim, or nearly so ...," that the legislation was designed to eliminate the danger of distortion and misrepresentation inherent in a report which merely selects portions, albeit accurately, from a lengthy oral recital. Quoting out of context is one of the most frequent and powerful modes of misquotation.

Thus, even if I were to accept the assertion initially made on behalf of Seitz that his overview "contained all of the information that Jacobsen had provided in writing *and*

---

26. *See, e.g., United States v. Gonzalez–Sanchez*, 825 F.2d 572, 586 (1st Cir.), *cert. denied sub nom. Lattore v. United States*, 484 U.S. 989, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987); *Palermo v. United States*, 360 U.S. 343, 355, 79 S.Ct. 1217, 1226, 3 L.Ed.2d 1287 (1959).

27. Trial Tr., December 7, 1992 at 40–41.

28. The United States submits that when an agent destroys rough notes which form the basis of a final report, those notes do not fall within the Jencks Act. That is the majority rule, absent special circumstances. See *United States v. Hinton*, 719 F.2d 711, 717–19 (4th Cir.1983), *cert. den.*, 465 U.S. 1032, 104 S.Ct. 1300, 79 L.Ed.2d 699 (1984); *compare United States v. Pollock*, 417 F.Supp. 1332, 1343 and n. 27 (D.Mass.1976) (exceptional case in which agent's bad faith destruction of his own rough notes violates due

process and requires dismissal of indictment). Courts are wary of creating a rule that requires agents to retain every rough draft and sketch of composite reports by threatening to respond to any failure to do so with a severe sanction. The same prudential concerns do not apply to requiring agents to retain personal statements provided them by cooperating percipient witnesses. Indeed, policy concerns directed to capturing a percipient witness's unexpurgated observations point in precisely the opposite direction.

In any event, in the present case, to call Jacobsen's complete narrative history merely "rough notes" is a misnomer.

29. See, for example, overview at 30.

30. Overview at 18.

31. Overview at 10.

*otherwise* during the course of his debriefings," Cunniff Affidavit, ¶ 5 (emphasis added),[32] I could not fairly find the overview to be an effective substitute for Jacobsen's personal handwritten narrative of his criminal history.[33]

–B–

Not only was Jacobsen's narrative history a "statement," but it was also in the "possession" of the prosecution. On the basis of my factual findings set out above, I conclude Seitz was functionally part of the United States Attorney's prosecutorial team,[34] and that his possession of Jacobsen's narrative history must be imputed to the government. Although Seitz testified at the post-trial hearing that no one told him not to destroy Jacobsen's notes, and that he thought he could properly destroy anything,[35] I do not consider his testimony credible on this point. Instead, I credit, in this regard, the testimony of Special Agent Cunniff, which I find to have been provided with complete candor.[36]

Cunniff stated that he requested Seitz conduct follow-up briefings with Jacobsen because Cunniff himself was busy; because Seitz already had "developed a rapport" with Jacobsen; and because Seitz was "in charge of Mr. Jacobsen's overall cooperation." [37] Cunniff testified that he told Seitz in about February, 1992 that agents, including Seitz, were under court order to preserve all notes; and that this instruction only repeated, more emphatically, an instruction he had previously given Seitz in July, 1991 to preserve all notes.[38] Cunniff stated his instructions about preserving documents were consistent with his understanding of the Jencks Act, although he may not have mentioned the Jencks Act by name, or noted that an informant's notes prepared for debriefing sessions were to be treated in the same way as other sorts of notes.[39] Further, Cunniff testified, Seitz had observed Cunniff's own document retention practices, although Seitz may not have seen Cunniff deal with notes like Jacobsen's.[40]

■ My conclusion, then, is that Seitz destroyed Jacobsen's notes in a manner that was at a minimum in reckless disregard of a court order and of Cunniff's instructions to

32. I note Seitz himself, however, later testified he never read all of Jacobsen's narrative history statements, Bail Review Hearing Tr., December 17, 1992 at 74–76, so it would be impossible for him to know whether his report reflected fully and accurately Jacobsen's handwritten narrative.

33. *Compare United States v. Innamorati*, 996 F.2d 456, 483 (1st Cir.) (destruction of material exculpatory evidence did not lead to miscarriage of justice when DEA interview form, hand-corrected by witness, and then lost by the government, "was essentially preserved by the grand jury testimony itself, during which the government attorney went through the form line-by-line") *cert. denied*, ― U.S. ―, ―, 114 S.Ct. 409, 459, 126 L.Ed.2d 356 (1993).

34. I note that my conclusion represents Seitz's own understanding of his role, at least as he described it at trial, before the separate hearing on the government's possible violation of the Jencks Act. *See* Trial Tr., December 11, 1992 at 5 (Seitz agreed that, for the period in question, he worked "both on behalf of the Maine Bureau of Intergovernmental Drug Enforcement and the Federal DEA").

35. Bail Review Hearing Tr., December 17, 1992 at 34–35. Seitz also claimed, somewhat inconsistently, that he could lawfully destroy Jacobsen's narrative history because it did not relate to the charges on which Mannarino, Damore, and

Schena were to be prosecuted. *Id.* at 37–39. The negative implication of this claim is that if the history did relate to the charges against the defendants, Seitz knew he could not destroy it, which of course is just what he denies.

36. In particular, I find Seitz's testimony at the Bail Review Hearing, December 17, 1992 at 34–35, when Seitz denied Cunniff ever told him to preserve witness statements, to be false.

37. Bail Review Hearing Tr., December 17, 1992 at 88.

38. Bail Review Hearing Tr., December 17, 1992 at 88. The order specifically requiring the government to preserve Jencks Act statements was entered by Magistrate Judge Collings on May 27, 1992. Special Agent Cunniff was, of course, correct that at least by the time of a defendant's arrest the government is under a continuing duty to preserve all Jencks Act material; he appears to have mistaken the specific date on which he told Seitz that the investigators were under a specific court order.

39. Bail Review Hearing Tr., December 17, 1992 at 114.

40. Bail Review Hearing Tr., December 17, 1992 at 115.

him.[41] I turn to the related question whether Seitz was a part of the prosecution team in this case and whether the narrative history was thus in the possession of the United States because Seitz's conduct can fairly be imputed to the government.

■ The government argues that "Seitz's role in [the federal investigation] was limited to that of a surveillance agent in the undercover investigations and contact person with the informant, Jacobsen[,] and in charge of Jacobsen's overall cooperation." Government's Memorandum in Opposition to Defendants' Motion for Judgment of Acquittal at 2. Seitz's role may have been so "limited," but, even so, it was a limitation without significance here: Seitz's federally-assigned duties made him part of the prosecution team.[42]

■ The Fifth Circuit has suggested that in determining federal responsibility in cases like these,

> Imposing a rigid distinction between federal and state agencies which have cooperated intimately from the outset of an investigation would artificially contort the determination of what is mandated by due process. Rather than endorse a *per se* rule, we prefer a case-by-case analysis of the extent of interaction and cooperation between the two governments.

*United States v. Antone,* 603 F.2d 566, 570 (5th Cir.1979). That is the sort of analysis I have undertaken here. I find my conclusions bolstered by the application of basic principles of agency law, for just as "[t]he criminal responsibility of a corporation can be founded on the collective knowledge of its individual employees and agents," so too can the prosecutorial responsibilities of the United States Attorney's office. *United States v. Osorio,* 929 F.2d 753, 761 (1st Cir.1991). *See Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) (citing agency principles as reason to attribute promise by single Assistant United States Attorney, unknown to prosecuting attorney, to office as a whole); *United States v. Antone,* 603 F.2d at 570 ("state investigators functioned as agents of the federal government under the principles of agency law utilized in *Giglio*"); *United States v. Morell,* 524 F.2d 550, 555 (2d Cir.1975) (prosecutor required to turn over Brady material possessed by DEA agent when agent had supervised informant and actively participated in investigation, acting as an "arm of the prosecutor"); *United States v. Butts,* 535 F.Supp. at 613–14 and n. 6 (Philadelphia police department officers part of DEA task force); *United States v. Myerson,* 684 F.Supp. 41, 44 (S.D.N.Y.1988) (special counsel is third party and not part of prosecution team). *But see United States v. Harris,* 368 F.Supp. 697, 709 (E.D.Penn.1973) ("Notwithstanding the coop-

41. I note that despite a willingness to press a number of meritless arguments the government does not contend that the Jacobsen narrative history and related notes, because they were destroyed, were not "in the possession of the United States" at the conclusion of Jacobsen's testimony and thus did not need to be disclosed. As the Ninth Circuit has noted, "[t]he Jencks Act is no less violated by the destruction of a statement than by its nonproduction. To hold otherwise would create an exception as broad as the Act itself." *United States v. Carrasco,* 537 F.2d at 377.

42. The government seeks to emphasize Seitz's formal role: his own Maine supervisors had refused to allow him to be temporarily assigned to the DEA. Thus, for example, the government notes "Seitz attended meetings in Boston more or less as a courtesy to the DEA," Memorandum in Opposition at 4, as a way of explaining Seitz's presence when Cunniff, William Sinnott (the federal prosecutor), and other federal officials met to plan the prosecution. Seitz's presence was a "courtesy" in the sense that the United States Attorney's Office apparently could not directly

sanction him for failure to assist them. But the threat of sanction was unnecessary because assist them he did, as the member of the task force "in charge of Jacobsen's overall cooperation." *Id.* at 2.

The government's assertion it had "no authority or control" over Seitz, *id.* at 29, is apparently true but irrelevant. Formally, neither the DEA nor the Assistant United States Attorney could order Seitz about; but they accepted this constraint, and rather than working with their paid informant themselves, they used Seitz as their liaison to him. The government's lack of "authority or control" may benefit Seitz (he may not have been insubordinate in failing to heed Cunniff's instructions); but it does not benefit the government in evading its responsibilities here. The arrangement simply raises questions about the government's decision to entrust crucial investigative duties to an agent they brought on their team but did not require to wear their uniform or immediately answer to their command structure.

erative law enforcement effort of the Federal and state authorities, the fact of the matter is that the reports in question were compiled by the city police officers, submitted as a matter of course to their superiors in the police department, and are now (and were at the time of trial) in the lawful possession and control of the Philadelphia Police Department"), *aff'd* 498 F.2d 1164 (3d Cir.), *cert. den.*, 419 U.S. 1069, 95 S.Ct. 655, 42 L.Ed.2d 665 (1974).

The Restatement (Second) of Agency (1958), section 272 (the section cited by the Supreme Court in *Giglio* ) provides that "the liability of a principal is affected by the knowledge of an agent concerning a matter as to which he acts within his power to bind the principal or upon which it is his duty to give the principal information." Seitz was clothed by the DEA with the indicia of agency. Comment a(4) applies specifically to Seitz's relation to the DEA and to the United States Attorney's office as "an agent [who] is employed by the principal to act in relation to a matter and to make reports concerning it to the principal or to other agents of the principal." [43] In short, I find the actions of Seitz to be those of the government, for, by imputation, they are the actions of an agent of the prosecution team.

–C–

The remaining question is whether Jacobsen's statement "relates to the subject matter as to which the witness has testified" on direct examination. The United States puts the matter baldly: "[t]he subject matter of Mr. Jacobsen's notes was his criminal history and drug distribution during the many years preceding his arrest in February, 1991. As such, the notes are exempt from the Jencks Act, as these matters were not the subject

matter of direct testimony." Government's Submission Regarding Hand–Written Notes of Witness at 3. *See also* Government's Memorandum in Opposition to Defendants' Motion for Judgment of Acquittal at 25–28. The government's position is a contrivance created by ignoring the way in which the prosecution actually sought to try its case.

The "key question," the First Circuit has observed, "is whether the information contained in the statements 'relates generally to the events and activities testified to' by the witness." *United States v. Ferreira*, 625 F.2d 1030, 1034 (1st Cir.1980), *citing, inter alia, United States v. Derrick*, 507 F.2d 868, 871 (4th Cir.1974). Further, "[i]f the statement relates to the general context of the testimony of the witness, it is not the prerogative of the Government nor even the court to pass upon the relevancy or the utility of the statement." *Id.* (citation and internal quotation marks omitted). *See, e.g., Derrick*, 507 F.2d at 870–71 (error in finding that statements concerning transactions prior to those testified to by witness were not within Jencks Act); *United States v. O'Brien*, 444 F.2d 1082, 1086 (7th Cir.1971) (statements concerning times earlier than the period charged in the indictment and earlier than the subject matter of the testimony can be Jencks Act material).

■ Jacobsen's statement relates specifically to his direct testimony at trial. Jacobsen testified that he was arrested in 1980 for possession of 8,000 pounds of marijuana, that he served seven months in a Massachusetts state prison, and that after his release he earned his living by buying and selling drugs.[44] He testified he sold varying amounts until his arrest on February 21, 1991 for possessing fifteen pounds of mari-

---

**43.** According to a diary of Jacobsen, provided by the prosecution to the defense in redacted form well after the hearings in this matter, Jacobsen records that he worked on his narrative history in February, 1992, and again in April and August, 1992. Jacobsen's diary confirms that Seitz's debriefings were conducted as part of a continuing effort to complete a comprehensive Intelligence Debriefing of Jacobsen at the request of the United States Attorney's office. I do not reach the question of whether the belatedly pro-

duced diary of Jacobsen itself falls within the Jencks Act, because that question has not been briefed or argued by the parties. I will, however, require the government to submit the entire diary in camera to me in order to determine whether any of the redacted portions should be disclosed to the defendants.

**44.** Trial Tr., December 3, 1992 (afternoon) at 10–12.

juana.[45] Further, Jacobsen testified he was "in the marijuana business" with Damore, and that he knew Mannarino "from dealing marijuana with him."[46] Jacobsen in his testimony did not limit his admissions of illegal activity with these two defendants to the period charged in the indictment; rather, by plain implication, his prior dealings with them stretched back into the 1980s, the period covered by his statement. For example, Jacobsen testified that it was Mannarino's practice to deliver "his marijuana in cardboard boxes";[47] because Jacobsen only purchased marijuana from Mannarino once in the period charged in the indictment, this testimony would be understood to relate to the parties' prior course of dealings. In conjunction with drug enforcement officers, Jacobsen worked out a cover story, to convince prospective associates that he "was still in the drug business."[48] Jacobsen's knowledge of and participation in drug dealings prior to the period charged in the indictment of the defendants was relevant because, as I observed concerning one of those dealings when the defendants objected to the government's efforts to introduce evidence about it, "[i]t does indicate to a prospective business affiliate what the capacity of the organization is and it goes to the formation of the relationship."[49]

Moreover, Jacobsen's activity as a drug dealer between 1980 and 1991 was also crucial to the value and credibility of his testimony as a whole, because he was proffered by the United States as a sort of expert witness, whose knowledge of the arcana of the drug trade was unchallenged by defense lawyers. Jacobsen's expertise was established through his general comments about his prior conduct as a drug dealer. In another case, a witness's mere remark that he had committed other crimes, even crimes committed with the charged defendants, might be insignificant; here, it went to the witness's capacity to testify about the meaning of the defendants' conduct as alleged in the indictment.

Jacobsen's knowledge of the drug trade was critical to the government's case, which consisted, in important part, of a series of tape recordings of conversations between Jacobsen and the defendants. These conversations were at times cryptic, at least absent Jacobsen's translation. A few examples of the range and scope of Jacobsen's testimony on these matters will give a sense of the whole. By "there's nothing I could do up here," Jacobsen "was referring to the fact that it would be difficult for me to sell high-priced marijuana in the State of Maine."[50] Jacobsen explained: a) the difference between skunk, Jamaican, and Mexican marijuana, skunk being "really high grade ... very expensive and very marketable," and Mexican being "high grade, good quality," both in contrast to Jamaican, Trial Tr., December 4, 1992 at 10, 11; b) the practice of freezing marijuana, as supplies are seasonal, id. at 11; c) that "my guy" means one's "source for marijuana," id. at 12; and d) the significance of Texas and Tucson in the marijuana trade, as pick-up points for Mexican marijuana, id. at 14–15. Jacobsen served as a dictionary for marijuana terms occurring on the tapes: "reliable guy," according to Jacobsen, is a source "that can deliver with a good price on a fairly consistent basis," id. at 16[51]; "stuff" or "regular stuff" is a poor

---

45. Trial Tr., December 3, 1992 (afternoon) at 10–12.

46. Trial Tr., December 3, 1992 (afternoon) at 12, 14.

47. Trial Tr., December 4, 1992 at 22.

48. Trial Tr., December 3, 1992 (afternoon) at 19.

49. Trial Tr., December 3, 1992 (afternoon) at 26.

50. Trial Tr., December 3, 1992 (afternoon) at 38.

51. Each of these definitions was produced by Jacobsen at the prompting of the Assistant United States Attorney. Thus, a typical colloquy is as follows:

Q. [reading from tape transcript]: "... all I have is these few of these other ones that I have, and, ah, and that's it. I'll be done—I'll be done because I won't—he's the only guy I work with because he's the only reliable guy. The rest of these guys are not reliable." What was he referring to there by "reliable guy"?
A. He's referring to his source, the person he's getting his marijuana from.
Q. And by characterizing him as reliable, what is he describing?
A. That means he can deliver with a good price on a fairly consistent basis.
Trial Tr., December 4, 1992 at 16.

grade of marijuana, *id.* at 12, 17; a "good hit" is selling a large quantity of marijuana at a good profit, *id.* at 18; "humpin' 'em left and right" means "selling a lot of marijuana because nobody else had any, because it was the only available," *id.;* "took the hit" means, in context, losing $80,000 in a drug bust, *id.* at 25; "runnin' like a maniac" means a dealer's strenuous efforts to sell marijuana to make up for the $80,000 loss, *id.* at 29; "brought somebody out of the clear" means bringing someone unknown to a meeting, *id.* at 37; "50 of them right off" and "15 to you" means 50 pounds of marijuana offered at $1,500 per pound, *id.* at 53; 18 "on the cuff" means marijuana sold at $1,800 a pound, but on credit, *id.* at 69. Jacobsen also testified to the quality of the marijuana in the government's exhibits in expert fashion ("[i]t's buddy, it's good quality marijuana and not too seedy, not too much twig in it, and it's still very aromatic at this time," *id.* at 64). Jacobsen's historical narrative relates directly to the testimony the government carefully elicited from him at trial.

### –D–

▮ Jacobsen's criminal history narrative was a statement as defined by the Jencks Act; it was in the possession of the government; and it "relates to the subject matter as to which the witness has testified." The United States, in failing to produce Jacobsen's statement after being ordered to do so, is in violation of the Jencks Act, and is subject to the Act's sanctions.

### IV

On its face, the Jencks Act provides only two remedies for the refusal of the United States to comply with its statutory disclosure directives. "[T]he court [1] shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion [2] shall determine that the interests of justice require that a mistrial be declared." 18 U.S.C. § 3500(d).

If I were to apply the first remedy—the striking of Jacobsen's testimony—I would ultimately be required to enter a judgment of acquittal because without the testimony of Jacobsen the government will have failed to adduce sufficient evidence to establish the defendant's guilt.

Moreover, without some further remedial order, the use of the second remedy—mistrial—raises the specter of *renvoi* because the government, through the destruction of the statements, was and remains unable to meet the letter of its statutory obligation under the Jencks Act.

The government suggests that the impossibility of recovering the statements should not be held against it and the jury verdict should stand without requiring that it perform the impossible: disclosing statements that no longer exist. In this regard the government puts itself in the position of the parricide who seeks the mercy of the court because it has become an orphan.

▮ Nevertheless, the two unsatisfactory alternatives, which on its face are all the Jencks Act presents, can be refined here to achieve the statutory disclosure purposes of the Act without requiring a choice which is alternatively unsatisfactorily severe or procedurally awkward. I have entered a conditional order pursuant to which I will strike Jacobsen's testimony—and *mutatis mutandis* enter judgments of acquittal—unless within 30 days from the issuance of this order the government produces Jacobsen and Seitz for depositions in which the defendants will be afforded the opportunity to reconstruct what the government has destroyed: a full first person statement of his criminal history. The testimony elicited in those depositions will be available to the defendants for the retrial which will follow from the mistrial—as opposed to judgments of acquittal—I will order upon the government's timely production of Jacobsen and Seitz for such depositions.

In fashioning this remedy, I note that I derive the power to do so from the language of the Jencks Act which permits the trial judge to order a retrial "in its discretion."

▮ In exercising this discretion, I have been sensitive to the established approach

adopted by the First Circuit for evaluating Jencks Act violations, which requires as a predicate to sanctions a "determin[ation that] the defendant has been prejudiced by the government's failure to disclose." *United States v. Izzi,* 613 F.2d 1205, 1213 (1st Cir.) *cert. denied sub nom. Santos v. United States,* 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 793 (1980). Finally, I have sought to tailor the sanction to redress the prejudice experienced by the defendants.

## A

■ The First Circuit has observed that, in the Jencks Act context, the determination of prejudice should not be unsympathetic to a defendant who faces a statutory violation by the government.

> The Supreme Court has repeatedly declared that, in Jencks Act cases, courts must narrowly construe the harmless error doctrine. *Goldberg v. United States,* 425 U.S. [94] at 111 n. 21[, 96 S.Ct. 1338 at 1348 n. 21] ("Since courts cannot 'speculate whether [Jencks material] could have been utilized effectively' at trial, [citation omitted] the harmless-error doctrine must be strictly applied in Jencks Act cases."); *Rosenberg v. United States,* 360 U.S. 367, 371[, 79 S.Ct. 1231, 1234, 3 L.Ed.2d 1304] (1959) ("An appellate court should not confidently guess what defendant's attorney might have found useful for impeachment purposes in withheld documents to which the defense is entitled.")

*United States v. Del Toro Soto,* 728 F.2d 44, 48 (1st Cir.1984).

Here, there is no need to invoke an indulgent *post hoc* reading of defense strategy or speculate about potential uses of the destroyed document. The document contained material central to the way in which the defendants fashioned their case.

The defendants did not deny they were drug sellers, but they did deny that they committed the particular charged conspiracy, and they also denied defendants were conducting a drug business of the range and scope charged by the government. Thus the nature and extent of the defendants' dealing with Jacobsen was material both to guilt and punishment. The jury found all defendants

guilty of the charged conspiracy; as to Mannarino and Damore, they found the drug dealings in the relevant period to be in an amount greater than 100 kilograms of marijuana; but as to Schena, they did not find dealings in that amount. After a careful review of the evidence as I observed it received at trial and as I have reexamined it in the transcript, I find the failure to provide Jacobsen's narrative undermines my confidence in the outcome of the trial either as to guilt or punishment. *Cf. United States v. Sepulveda,* 15 F.3d 1216, 1221 (1st Cir.1993); *Barrett v. United States,* 965 F.2d 1184, 1189 (1st Cir.1992); *United States v. Sanchez,* 917 F.2d 607, 616–18 (1st Cir.1990), *cert. denied,* 499 U.S. 977, 111 S.Ct. 1625, 113 L.Ed.2d 722 (1991).

With respect to the conspiracy charged, the defendants contended that while they may have on occasion referred to various large amounts of marijuana—claiming they had just sold some large amount, or could readily obtain it—those statements were merely salesmen's puffery, and that the modest lots the government actually seized from their sales demonstrated that Mannarino and Damore were small-time dealers who engaged in separate transactions with Jacobsen which were not part of the charged conspiracy. To find otherwise the jury was required to rely to some degree upon Jacobsen's characterization of their relationship.

■ On the critical element of amount, Jacobsen's testimony was similarly vital. The statutory scheme of the charged offense, 21 U.S.C. § 841(b)(1), makes the penalty turn on the amount of marijuana involved. For these defendants, if the amount was less than 50 kilograms the maximum penalty is 10 years' imprisonment, 18 U.S.C. § 841(b)(1)(D); if the amount was 50 kilograms or more but less than 100 kilograms the maximum penalty is 30 years' imprisonment, 18 U.S.C. § 841(b)(1)(C); but if the amount involved was 100 kilograms or more of marijuana the penalty is a minimum mandatory 10–year sentence with a maximum of up to life imprisonment. In order to avoid the potential need for retrial if the amount of marijuana is determined to be an essential

element of the offense, the defendants consented to have me put the question of amount to the jury in special questions. While the jury found Schena was not involved in 50 kilograms or more of marijuana transactions .in the conspiracy, they also found Mannarino and Damore were engaged in a conspiracy involving 100 kilograms or more, thus exposing them to the minimum 10 year prison sentence. The jury's nuanced conclusion about the amounts of marijuana the several defendants were involved with reflected a response to the credibility of Jacobsen's testimony concerning the nature and extent of his marijuana dealings with each of them. By undermining his credibility on this vital topic, the defendants Mannarino and Damore could significantly affect the level of punishment they could receive even if the conspiracy itself were proved.

The nature and extent of Jacobsen's dealings with the defendants is disputed. It is apparent that the process of debriefing served to sharpen and develop Jacobsen's stated recollection regarding them. At the outset, in his initial debriefing, for example, Jacobsen identified defendant Guy Mannarino as "Guy Mastriami." The explanation of the debriefing process by Seitz makes clear that evolving revisions accompanied the development of the Jacobsen narrative history and the Seitz report. Jacobsen's notes and narrative history would necessarily have reflected the progress of this development. It is more than a reasonable probability that "[a]t a minimum," as defense counsel suggests, "defendants would have been able to show that Jacobsen had failed to provide any meaningful details of his alleged [prior] dealings with Mannarino until over a year after his initial debriefing." Defendant's Memorandum in Support at 24.

Defense counsel vigorously sought to impeach Jacobsen's credibility, and they had several useful approaches, including Cunniff's testimony that Jacobsen had concealed, until the eve of trial, a secret Swiss bank account

containing tens of thousands of dollars of drug profits.[52] Thus, while material provided in the narrative history might only have been cumulative, at a certain point, a difference in accumulation becomes not merely a matter of degree but a matter of kind. If defense counsel had been able to show that Jacobsen had exaggerated his drug dealings with Mannarino and Damore in his narrative history from what they were in fact, their argument that Jacobsen not only had a motive to make out defendants as bigger dealers than they were, but that he had actually done so, would have taken on determinative force. Jacobsen conceded he lied about his own illegal assets; but he maintained his allegations about the defendants were consistently true. If defense counsel had shown at least some of those prior statements were false or simply overstated, they could have shown Jacobsen to be a liar of a different kind. Jacobsen would have appeared much less reliable in general, and a less convincing interpreter of the defendants' cryptic taped comments of drug sale amounts in particular.[53]

### B

The government, relying upon a recent opinion of the Court of Appeals, suggests that the predicates for a Jencks Act sanction are not merely prejudice but bad faith by the government when the government destroys Jencks Act material. *See generally, United States v. Femia,* 9 F.3d 990 (1st Cir.1993). It is, however, apparent that *Femia* does not govern here. *Femia* was concerned with the minimal constitutional protections against infringement by law enforcement failure to preserve evidence; the issue here is interpretation of a statutory provision which is designed to enhance and refine minimal due process protections. A review of the briefing in *Femia,* which concerned the ultimate sanction of dismissal pre-trial, discloses no reference to Jencks Act issues. Indeed, reference to the Jencks Act would have been prema-

---

52. Trial Tr., December 3, 1992 (morning) at 68.

53. For example, Mannarino stated on tape that Damore's "done about—he's done about—he's done about probably 250." Trial Transcript, December 9, 1993 at 31. Mannarino could have meant that Damore had sold $250,000 worth of

marijuana obtained from Mannarino, or that Damore had sold $250,000 worth of marijuana in sum, from all sources. Jacobsen interpreted Mannarino's statement to include only marijuana Damore sold for Mannarino. *Id.* at 52.

ture because Jencks Act disclosure is not mandated until after the witness whose statement is subject to production "has testified on direct examination." 18 U.S.C. § 3500(a) & (b).

 As the case law interpreting the harmless error rule in the context of Jencks Act violations has made clear, *see generally United States v. Del Toro Soto,* 728 F.2d at 48, the Jencks Act remedial scheme for disclosure of witness statements is to be given a construction more liberal than that applicable to bare constitutional claims. I am persuaded that establishing the "good faith" of violations of Jencks Act obligations—while perhaps relevant to fashioning the appropriate remedy—is not sufficient to insulate the government from sanction for an established statutory violation. *See, e.g., United States v. Truong Dinh Hung,* 629 F.2d 908, 921 (4th Cir.1980) ("destruction of Jencks Act material may violate at least the spirit of the Act, even if the material is destroyed without bad faith following a routine procedure"), *cert. denied,* 454 U.S. 1144, 102 S.Ct. 1004, 71 L.Ed.2d 296 (1982); *United States v. Carrasco,* 537 F.2d 372, 376 (9th Cir.1976) (routine destruction of witness's diary "is no less a violation of the Jencks Act because it was pursued in good faith").

Moreover, even if I were to import the *Femia* requirement that government bad faith be shown as a predicate to a Jencks Act sanction, I would be prepared to find it here. The government's calculated decision to leave the preservation of materials whose disclosure was plainly required to a person unprepared by disposition or training to perform that function cannot be dismissed as mere negligence. It represents a knowing failure to do what the law requires. To understand why this is so, a page of history is worth a volume of logic. Given the historic pattern in the treatment of disclosure responsibilities in the United States Attorneys Office for this District, it does not require any strain to find that the disclosure responsibilities were not undertaken in good faith. This case presents yet another example of concerted indolence in pursuing disclosure by the United States Attorney's Office and a willful blindness to the failure of its agents who had disclosure duties to fulfill them. This pattern is evident in case law from the Court of Appeals over the past decade.

More than ten years ago in *United States v. Kincaid,* 712 F.2d 1, 3 (1st Cir.1983), the First Circuit noted, when Coast Guard personnel destroyed evidence, that "no one took the steps necessary to preserve the tapes. The excuses that their custodians offer—that the requests were too broadly worded, that they were 'too busy' to make certain that the tapes were preserved—are lame. The best we can say is that the United States Attorney has promised to prevent recurrences." Three years later the Court of Appeals in *United States v. Ingraldi,* 793 F.2d 408, 413 (1st Cir.1986) found that "[i]t was sloppy practice on the part of the prosecutor not to have discovered that the chief government witness had once been designated a government informant." And, with a certain weariness four years later the First Circuit observed in *United States v. Osorio,* 929 F.2d 753, 760 (1st Cir.1990) "[w]e have had occasion before to comment on 'sloppy practice' in the prosecutor's office with respect to disclosure issues concerning the impeachable pasts of cooperating government witnesses. The negligence here fits that pattern of practice."

The promise in *Kincaid* to prevent recurrent destruction of evidence by those to whom the government prosecutors cede preservation and disclosure responsibilities has proved illusory. And it is not merely in the appealed and reported cases that insensitivity to disclosure requirements has been encountered. The judges of this court have severally found it necessary to issue numerous unreported day-to-day trial directions and decisions to police discovery. An appropriate recognition of disclosure responsibilities by the United States Attorneys Office could obviate the need for judicial intervention. The issue is of sufficient concern that the District Court for the District of Massachusetts has determined to review its present local rules governing criminal discovery with a view toward increased prescriptiveness in discovery responsibilities.

Yet the lame excuses identified in *Kincaid* and the sloppy practices identified by *Ingral-*

*di* continue and are illustrated in this case, which bears an eerie resemblance to *Osorio*. The First Circuit in *Osorio* noted efforts by the prosecuting attorney to insulate himself from disclosure nonfeasance through reliance on a failure to make adequate inquiry of those with knowledge concerning the impeachable past of the government's principal informant witness. That is what occurred here. It is, of course, remarkable that a government attorney adequately preparing the witness upon whom the prosecution's case depends would fail to make sufficient inquiry himself to learn that, while the case was pending, the witness—under the direction of his assigned law enforcement contact—was composing a written *Apologia Pro Vita Sua* of his past criminal activity. But this remarkable inattention to witness preparation does not relieve the government of disclosure responsibilities. As the First Circuit cautioned in *Osorio*, an opinion issued a year before Jacobsen's arrest and cooperation began:

> it would be no adequate response for trial counsel to suggest negligence on the part of the case agent or the relevant investigative agency. Trial counsel is the member of the government team who is an officer of the court. In this sense, it may be a form of insubordination if the investigative agents working on the case for trial counsel are not forthcoming in satisfying the government's disclosure obligations. But the prosecutor is duty bound to demand compliance with disclosure responsibilities by all relevant dimensions of the government. Ultimately, regardless of whether the prosecutor is able to frame and enforce directives to the investigative agencies to respond candidly and fully to disclosure orders, responsibility for failure to meet disclosure obligations will be assessed by the courts against the prosecutor and his office.

929 F.2d at 762.

 The nature and substance of the government's argument here suggests a continued unwillingness to accept responsibility for its disclosure responsibilities. While forceful argument is expected on behalf of the government, an argument, for example, that Seitz did not act in bad faith because no one told him about the duty to maintain Jencks Act statements is simple recusancy. The government, of course, is free to choose which of its witnesses to rely upon. But concluding that either Seitz, as the government has, or Cunniff, as I do, is credible regarding whether Seitz was told of the outstanding court order is ultimately not dispositive. First, it is an imperative duty on the part of government counsel to assure *all* involved in the disclosure chain are aware of their responsibilities. Second, if Seitz was not made aware of Jencks Act duties reinforced by a specific court order, it is the fault of government counsel in failing to make all members of the team understand fully their duties. In any event, I have found that Seitz was made aware of his duties of preservation and disclosure and the apparent failure of government counsel to find out—until the middle of trial—that he had not done so shows willful blindness not merely to disclosure responsibilities but to minimal needs of preparation of trial witnesses. In short, the responsibility remains with government counsel. That responsibility has not been met here. If anything other than intentional flouting of a court order or a statutory command can be found to be bad faith, it is the unpoliced delegation of preservation and disclosure responsibilities to the unwilling and, perhaps, unknowing. The United States Attorneys Office can no longer shirk responsibility by suggesting a failure by others to do what the law requires government counsel to secure. In this setting malfeasance may fairly be equated with misfeasance or nonfeasance if a finding of bad faith is necessary.

–C–

 There is a third branch to the *Femia* analysis, which, although not applicable by terms to analysis of the Jencks Act violation, is useful in framing the issue for purposes of remedy. This is the element of "obtain[ing] comparable evidence by reasonably available means." *Femia*, 9 F.3d at 993 quoting *California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 (1988). In bare constitutional analysis of evidence destruction claims, a defendant is obligated to show that the lost evidence was

irreplaceable. Concern with reasonable availability, while not an element of a statutory Jencks Act claim, should guide the selection of remedy. If it is possible to reconstruct the lost material, that should be done in order to permit a fact finder to determine the case on its merits and avoid the ultimate sanction of dismissal or judgment notwithstanding a verdict on misconduct grounds. Here the criminal narrative is to a significant degree irreplaceable because its principal exculpatory value would come from using it to demonstrate the development of a recently contrived collection of detail about prior dealings with the defendants. The unfolding of Jacobsen's recollections over time, which the criminal narrative would have demonstrated, cannot be reproduced.

As a reasonable—if not wholly satisfactory—alternative, however, it is possible to permit the defendants a full opportunity to depose both Jacobsen and Seitz. Such depositions are to be preferred to permitting a wide ranging inquiry of the witnesses for the first time before the jury at trial. First, the defendants, as the victims of the destruction of the evidence, would be free without concern for jury misunderstanding or prejudice to develop the evidence fully. Second, undue consumption of trial time would be avoided. Third, the testimony would be available for purposes of impeachment or other appropriate use by the defendants with adequate opportunity to excise any self serving or prejudicial statements that might be insinuated into the transcript by the deponents.

I am loathe to let a criminal case be decided by default because of failures by government counsel to meet disclosure responsibilities. The remedy of pretrial depositions provides an adequate mechanism to remedy that failure. It also has the serious consequence of shifting somewhat the balance of advantage in a criminal trial, where only the government customarily is able to obtain pretrial testimony under oath, and thus is a remedy which appropriately sanctions the government's recurrent refusal to accept and implement its obligations to preserve and provide required discovery to criminal defendants.

## IV

Accordingly, for the reasons set forth more fully above, I will enter a revised [54] order with respect to defendants' motions for judgment of acquittal, to dismiss or for a new trial. As noted at page 17 n. 43, *supra*, I also order the government to submit forthwith *in camera* an unredacted version of Jacobsen's diary.

## REVISED ORDER WITH RESPECT TO DEFENDANTS' MOTIONS FOR JUDGMENT OF ACQUITTAL, TO DISMISS OR FOR A NEW TRIAL

The court having determined that the government engaged in a violation of the Jencks Act with respect to the witness Jacobsen by failing to produce his personal narrative statement of criminal activity, a statement in its possession which related to the subject matter of the testimony elicited by the government from him at trial, and further finding that were the testimony of the witness Jacobsen stricken from the record, there would be insufficient record evidence to support the convictions herein, it is hereby:

ORDERED that the Defendants' Motions for Judgment of Acquittal and to Dismiss be DENIED and the Defendants' Motions for a New Trial be ALLOWED on the condition that the government produce the witnesses Jacobsen and Seitz for pretrial depositions within 30 days of the date of this Order, failing which the testimony of the witness Jacobsen will be stricken and a judgment of acquittal will be entered by this court.

---

**54.** The government sought a revision or clarification of the order originally entered December 17, 1993 permitting the deposition of Jacobsen. This clarification was apparently sought to start the appellate time clock running anew and thereby extend the time for taking an appeal in order to permit the full statement of reasons provided in this Memorandum to be reviewed by the parties charged with considering whether to authorize an appeal. That Motion is allowed by entry of the Revised Order.