USCA1 Opinion

 

 February 8, 1996 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-2260 UNITED STATES OF AMERICA, Appellee, v. GEORGE H. BENNETT, Defendant, Appellant. ____________________ No. 94-2300 UNITED STATES OF AMERICA, Appellee, v. LIONEL LUSSIER, Defendant, Appellant. ____________________ ERRATA SHEET The opinion of this Court, issued on February 1, 1996, is amended as follows: On page 9, line 7, replace "then had no reason to lie" with "they had no reason to lie". UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-2260 UNITED STATES OF AMERICA, Appellee, v. GEORGE H. BENNETT, Defendant, Appellant. ____________________ No. 94-2300 UNITED STATES OF AMERICA, Appellee, v. LIONEL LUSSIER, Defendant, Appellant. ____________________ ERRATA SHEET The opinion of this Court, issued on February 1, 1996, is amended as follows: On page 8, 3rd line of 2nd paragraph, insert a period after "1986)" and delete "which appears pretty closely in point." UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-2260 UNITED STATES OF AMERICA, Appellee, v. GEORGE H. BENNETT, Defendant, Appellant. ____________________ No. 94-2300 UNITED STATES OF AMERICA, Appellee, v. LIONEL LUSSIER, Defendant, Appellant. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Morton A. Brody, U.S. District Judge] ___________________ ____________________ Before Selya and Boudin, Circuit Judges, ______________ and Saris,* District Judge.  ______________ ____________________ Malcolm J. Barach for appellant Bennett.  _________________ William Maselli for appellant Lussier. _______________ F. Mark Terison, Assistant United States Attorney, with whom Jay _______________ ___ P. McCloskey, United States Attorney, was on consolidated brief for _____________ the United States. ____________________ February 1, 1996 ____________________  ____________________ *Of the District of Massachusetts, sitting by designation. BOUDIN, Circuit Judge. George H. Bennett and Lionel _____________ Lussier were each charged with conspiracy to possess marijuana with intent to distribute, 21 U.S.C. 846; carrying or using a firearm during and in relation to a drug trafficking offense, 18 U.S.C. 924(c)(1); and unlawful possession of a firearm by a convicted felon, 18 U.S.C.  922(g)(1). The charges stemmed from a bizarre March 1994 episode in which Bennett, Lussier, and Gary King, in an attempt to avenge a previous drug-related attack and robbery against mutual friend Ronald Madore, mistakenly entered the wrong home and assaulted the occupants, ultimately shooting one of them through the finger.  Madore and King were indicted for various offenses; both pled guilty, cooperated with the prosecution, and testified against Bennett and Lussier. After a five-day jury trial in August 1994, Bennett and Lussier were convicted on all counts and sentenced, respectively, to 360 and 378 months in prison. In this consolidated appeal, Bennett and Lussier challenge their convictions and sentences on many grounds. We address the more colorable of these claims, setting forth pertinent facts as necessary. First. Both Bennett and Lussier challenge the _____ sufficiency of the evidence supporting conviction on each count. Neither denies participating in the assault but they dispute issues of intent and their precise role in the -2- -2- events. Our familiar task on review of sufficiency is to consider the record as a whole and to determine, viewing the evidence in the light most favorable to the verdict, whether a rational jury could find guilt beyond a reasonable doubt. United States v. Luciano-Mosquera, 63 F.3d 1142, 1149 (1st _____________ ________________ Cir. 1995). A conspiracy conviction can be supported by either direct or circumstantial evidence of an illegal agreement--in this case to possess marijuana with intent to distribute. See United States v. Ruiz, 905 F.2d 499, 506 (1st Cir. 1990). ___ _____________ ____ At trial, there was testimony that on the day of the mistaken raid, Bennett, Lussier, and King, along with two other friends, drank and discussed seeking revenge for a previous attack in which mutual friend Ronald Madore, a small-time marijuana dealer, was beaten and robbed of marijuana, money, and guns. The group continued their drinking and their discussion that evening at Madore's house. Madore testified that Bennett, Lussier, and King planned to beat up the man Madore suspected was behind the previous attack, one Wayne Hathorne, take any marijuana he had (along with any money) and give the marijuana to Madore so he could sell it and share the proceeds. King's testimony regarding the plan was less definitive; he stated at one point that they only intended to beat Hathorne, but elsewhere that both -3- -3- discussed stealing Hathorne's marijuana and giving it to Madore because "[h]e deals in it." It is undisputed that shortly after this conversation the four men--the appellants, Madore and King--left Madore's house in Bennett's car and drove to a trailer home, which they mistakenly believed was Hathorne's. While Madore waited in the car, Bennett, Lussier and King entered the trailer and terrorized occupants David Wing, Michelle Morin and their children, physically assaulting Wing and Morin while a gun was held to Wing's head. There was testimony, described later in this opinion, that all four men knew of the proposal to bring a gun and that first King and then Lussier carried the weapon. Wing testified that during the attack all three men were shouting "[w]here is our dope?"; Morin heard them shouting about drugs but did not specify whether it was particular individuals or all of them. Wing and Morin, who had no drugs, tried to convince their assailants they had the wrong house. These pleas were met with a threat to kill Wing. In an ensuing struggle for the gun Wing was shot through the finger. Bennett, Lussier and King immediately fled the scene without taking anything.  Appellants now insist, as they argued to the jury, that the plan was merely to beat Hathorne and did not include seizing drugs, and that much of the testimony of Madore and -4- -4- King was false. But such credibility assessments are for the jury and nothing here justifies disturbing the jury's rational conclusion that Bennett and Lussier joined in a plan to, among other things, steal marijuana and give it to Madore to sell.  As to the section 924(c)(1) charge of carrying or using a gun during a drug crime, Lussier concedes the sufficiency of the evidence against him, while Bennett maintains that nothing showed that he had carried or used a gun in relation __ to the marijuana conspiracy. But Bennett was also charged with aiding and abetting the carry or use offense. Thus, his conviction can be sustained under 18 U.S.C. 2 if Bennett knew a firearm would be carried or used by a co-conspirator in the drug trafficking offense and willingly took some action to facilitate the carriage or use. Luciano-Mosquera, ________________ 63 F.3d at 1150. At trial there was testimony that the gun used in the attack was taken from a couch in Madore's house under circumstances where Bennett could have seen it. Madore testified that he told the other three they did not need a gun, but each said he would rather take it. King held the gun on the ride to Wing's home while sitting in the passenger seat beside driver Bennett; King said that he did not conceal the gun in the car, although he conceded he may at some point -5- -5- have placed it in his waistband. It was his impression the others were aware he had the gun.  From this evidence a jury could find that Bennett knew that one of his companions was carrying the gun when they committed the attack, and facilitation is essentially undisputed since Bennett provided his car to transport himself, his co-conspirators, and the gun to execute the raid. In Luciano Mosquera, we upheld an abetting conviction ________________ because the defendant provided a house for meeting where guns were displayed and discussed, and later used during drug trafficking crime. 63 F.3d at 1150. In sum, once knowledge on the part of the aider and abettor is established, it does not take much to satisfy the facilitation element.  With respect to adequacy of evidence on the felon-in- possession charge, 18 U.S.C. 922(g)(1), Bennett and Lussier make only the narrow claim that the evidence failed to establish that the gun had travelled in interstate commerce, the jurisdictional element of that offense. The gun was not introduced into evidence since it had been discarded by King and Madore. But from direct testimony the jury was entitled to find that it was a .22 caliber "Single-Six" made by Sterm Ruger and that Sterm Ruger was an out-of-state manufacturer. Appellants argue that the gun could have been a replica fashioned by an in-state gunsmith. This remote possibility had only the most tenuous evidentiary support, namely, a -6- -6- witness or two said such a gun could be fabricated but at _____ significant cost. The overwhelming probability was that the gun was authentic and had been transported--at some time--in interstate commerce. Certainly the jury's conclusion that the gun was genuine and had previously traveled in commerce was not irrational. Cf. United States v. Kirvan, 997 F.2d ___ _____________ ______ 963, 966-67 (1st Cir. 1993). Second. Shortly into its deliberations, the jury ______ requested the testimony of victims Wing and Morin. The trial judge conferred with counsel and then instructed the jury to use their recollections, adding that he would provide the requested testimony if the jury still found it necessary. After further deliberations the jury asked for only the direct testimony of Wing and Morin. Over defense objections, the judge then had the direct testimony of Wing and Morin read back to the jury. Immediately after the read-back, the judge asked jurors as a group whether they would also like to hear the cross or other testimony of the two witnesses; none did. Defense counsel moved for a mistrial, which was denied. The appellants concede that it would have been within the trial judge's discretion to have read to the jury all of ___ Wing and Morin's testimony; but they say that providing only the direct examination was prejudicial--indeed, unconstitutional--because the unread cross-examination responses of both witnesses were at "striking variance" with -7- -7- their testimony on direct. No examples of such variances are mentioned. No case law is provided to suggest that the jury may not select what it wishes to hear. The trial judge's decision whether or not to grant a request to read back testimony requested by a jury is reviewed for abuse of discretion, United States v. Akitoye, ______________ _______ 723 F.2d 221, 226 (1st Cir. 1991); and we think that this is equally true of the judge's decision whether the jury should be made to hear additional, related testimony that the jury made clear it did not need to rehear. Of course, such discretion is not unlimited. And certainly the trial judge should exercise great care when the testimony the defense counsel wants the jury to hear is the cross-examination of the very witnesses whose full direct testimony has just been reread. But no inflexible rule exists that the cross must always be read. United States v. Wright-Barker, 784 F.2d 161, 174 ______________ _____________ (3d Cir. 1986). In plenty of cases, the direct testimony of another witness might be far more relevant in assessing the _______ testimony of the witness whose testimony the jury requested. Each case must be decided on its facts, and it is the appellant's burden to show that the trial judge acted unreasonably. Here on appeal, with ample leisure to compare the direct and cross of Wing and Morin, appellate counsel has still made no specific showing as to why it was unfair in ________ __ -8- -8- this case for the district court to omit cross-examination _________ that the jury did not want. Because this is a criminal case, we have read the direct and cross-examination of the two witnesses in order to assure ___ ourselves that the district court's action did not cause any miscarriage of justice. We have found nothing to suggest that the cross-examination was vital or contained more than the customary measure of minor variations or inconsistencies. Prior to requesting the read-backs, the jury could quite reasonably have concluded that it credited these witnesses' direct testimony--they had no reason to lie--and then sought the read-back to refresh the jury's own recollection on some specific points. There is no merit in two other related claims of error. Appellants now say that the jury was confused or bewildered by the trial judge's offer to have the cross reread; but the trial judge found otherwise. We have read the colloquy and find no reason to doubt the trial judge's conclusion. Appellants also say that the jury should have been cautioned not to give the direct testimony special weight, e.g., United ____ ______ States v. DeSoto, 885 F.2d 354, 363 (7th Cir. 1989), but no ______ ______ such request was made at trial. Third. In closing, the prosecutor referred several _____ times, without objection, to the "selective focus" of the defense. In rebuttal, the prosecutor described a defense -9- -9- argument as a "diversion" that "doesn't pass the laugh test" and again referred to the defense's "selective focus." Defense counsel immediately objected to the "diversion" remark. After the summations, defense counsel requested a curative instruction that the jury disregard these remarks to the extent that they "degraded legitimate defenses." The judge found the comments unobjectionable and gave only the standard instruction that arguments of counsel are not evidence. Appellants now maintain that both of the prosecutor's remarks improperly denigrated defense counsel as well as the defense strategy. The prosecutor is expected to refrain from impugning, directly or through implication, the integrity or institutional role of defense counsel. United States v. _____________ Boldt, 929 F.2d 35, 40 (1st Cir. 1991). But "selective _____ focus" remarks were part of a larger metaphor used by the prosecutor in urging the jury to "act as a camera" and keep "focused" on the evidence. In context, the remarks merely echo the truism that lawyers highlight helpful facts and retreat from unfavorable ones. The prosecutor edged closer to trouble in his rebuttal remarks by calling a defense argument a "diversion" that does not "pass the laugh test." But summations in litigation often have a rough and tumble quality; in fact, one of the defense summations here twice referred to the government's -10- -10- "desperation" to prove charges "they can't prove." We do not think that the prosecutor's remarks on this case crossed the line. See generally United States v. Ortiz-Arrigoitia, 996 _____________ _____________ ________________ F.2d 436, 440-41 (1st Cir. 1993), cert. denied, 114 S. Ct. _____ ______ 1366 (1994). Nor was the refusal to give the specially requested instruction reversible error; indeed, a jury would not have made much sense of the requested language. Fourth. At trial Bennett and Lussier sought access to a ______ police interview report with a government witness, Pete McFarlane, a friend of the appellants who was with them before and immediately after the attack. The interview report, the defendants believed, might have some bearing on McFarlane's testimony that Lussier admitted in the post- attack meeting that he was holding the gun when Wing was shot. Defendants urged that the interview report might be discoverable under Fed. R. Crim. P. 16, the Jencks Act, 18 ______ U.S.C. 3500, or Brady v. Maryland, 373 U.S. 83, 87 (1963). _____ ________ The trial judge reviewed the report in camera and concluded _________ that it was not discoverable. On appeal, all three bases for disclosure are urged. Rule 16 does not apply since its pertinent language is directed to statements made by a defendant to a known government agent, United States v. Burns, 15 F.3d 211 (1st _____________ _____ Cir. 1994), and a statement by Lussier or any co-conspirator to McFarlane immediately after the event is not even arguably -11- -11- in that category. Appellants suggest that Burns demands more _____ of the government than the bare minimum prescribed in the rule; but that is not what Burns says. Compare 15 F.3d at _____ _______ 215-16 n. 2. The Jencks Act requires inter alia production __________ of writings that are "substantially verbatim" recitals of pre-trial statements made by a government witness and that relate to the subject of the witness' trial testimony. 18 U.S.C. 3500(e)(2). We have reviewed the interview report at issue which contains only a few isolated direct quotations (none pertinent here) and which is neither structured nor phrased as a verbatim report. In our view the trial court did not commit clear error in refusing to treat the six-page report as a substantially verbatim recordation of the interviewee's own words. See United States v. Foley, 871 ___ ______________ _____ F.2d 235, 238-39 (1st Cir. 1989). Lussier offers a clever gloss on the Jencks Act, urging that any simple statement in an interview report--e.g., ____ "Lussier held the gun"--must because of its brevity be essentially verbatim and thus discoverable under the Act. But this attempt to divide up the document has been rejected even in the case of isolated direct quotations, Foley, 871 _____ F.2d at 238-39. We note also that the report (a formal typed form) was clearly made after the interview and not during it. United States v. Consolidated Packaging, 575 F.2d 117, 129 _____________ _______________________ (7th Cir. 1978) (requiring a contemporaneous recordation). -12- -12- The Brady claim is more difficult for the government _____ because the interview report does say that Lussier carried the gun, but attributes that information to Bennett rather than Lussier. The report might thus appear to have some impeachment value, possibly qualifying it as Brady material _____ under United States v. Bagley, 473 U.S. 667, 677 (1985). The _____________ ______ inference is pretty limited in this case: not only was the meeting a confusing one but the interview report does not exclude--and may even invite--the inference that Lussier acquiesced in the suggestion that he had been carrying the gun. In all events, even if we assume that the report should have been produced under Brady, the failure to do so was _____ harmless. At trial, both Bennett and King testified that Lussier had held the gun; and while Bennett had a personal interest in so testifying, King did not. Further, if McFarlane had been "impeached" by the report in question, the jury would have been told, once again, that Lussier had held the gun. At the post-attack meeting, where Lussier was present, Bennett had no reason to lie and good reason not to do so. Fifth. The last noteworthy issue concerns the aiding _____ and abetting instructions. Bennett and Lussier were charged in both firearms counts--the possession and the use or carry counts--both as principals and on an aiding and abetting -13- -13- theory under 18 U.S.C. 2. As to both gun offenses, Bennett and Lussier say that the aiding and abetting instruction permitted the jury to convict without the required scienter (for example, even if the jury believed that the assistance was unintentionally rendered). On the possession count, the jury was told that a defendant could be convicted if he "knowingly possessed the firearm . . . or aided and abetted such possession"; parallel language was used on the companion count ("knowingly used or carried a firearm or aided and abetted the use or carrying a firearm"). The appellants complain that the word "knowingly" was not used immediately before "aided and abetted" in each instance; but this is irrelevant because "aiding and abetting" was separately defined in the instructions, which must be read as a whole. United States v. Fontana, 948 F.2d _____________ _______ 796, 801 (1st Cir. 1991).  In the aiding and abetting definition itself, the district court charged in pertinent part that "the Government must prove beyond a reasonable doubt that a defendant associated himself with the venture, participated in it as something that he wished to bring about, and sought by his actions to make it succeed." This language obviously imports a scienter element ("wished to bring about"; "sought by his actions"), and it is the precise language approved by this -14- -14- court in prior cases. E.g., United States v. Loder, 23 F.3d ____ _____________ _____ 586, 590-91 (1st Cir. 1994). But our journey is not quite over. The Loder language, _____ which serves reasonably well in most situations, may not perfectly cover abnormal ones. Here, a potential ambiguity exists: the term "venture" in Loder is intended as catch-all _____ for the notion of a crime committed by another ("the principal") for which the government aims to hold the defendant responsible as an aider or abettor, making the defendant "punishable as a principal." 18 U.S.C. 2. See ___ generally 1 Sand, et. al, Modern Federal Jury Instructions _________ _______ _________________________________ para. 11.01 (1995). Where only a single crime is involved, confusion is unlikely under Loder's language because there is _____ only one venture. Here, however, the defendants were charged in the first count with a drug possession conspiracy. In theory the term "venture," used only as part of the general definition of aiding and abetting, might lead a jury to think that the venture in question was the drug conspiracy and not the possession or use-and-carry offense. If so, the jury might also think that it could convict the defendant who did not ___ personally possess or use or carry a gun, so long as the aider or abettor "wished to bring about" the drug possession "and sought by his actions to make [that venture] succeed."  -15- -15- The problem, needless to say, is not that any element of the offense was omitted from the charge, cf. United States v. ___ _____________ Lopez, No. 94-2277, slip op. at 12 (1st Cir. Dec. 14, 1995), _____ but that a possible ambiguity inhered in the instruction. The defendants made several timely objections to the aiding and abetting instructions at trial, although their proposed solutions were of questionable use. But any ambiguity in the charge was irrelevant in Lussier's case (the only evidence, obviously accepted by the jury, was that he was the principal), and it was harmless in Bennett's case. Given the evidence, Bennett could only have been convicted as an aider and abettor. But--as already related-- Madore, who supplied the gun, testified that bringing it had been discussed in advance and that Bennett, Lussier and King all said they wanted it brought; King, who sat next to Bennett in the car, testified that he carried the gun in his lap without concealment for at least part of the ride. Unlike Bennett, who claimed to have had no knowledge of the gun, King and Madore were not on trial. If there was an ambiguity in the instruction, it did not affect the result. Appellants' remaining claims have been considered but do not require discussion. In a few instances, Bennett has made claims that are not fully developed, such as his cursory attack on the intoxication instruction, or beyond our jurisdiction (e.g., the refusal of a downward departure). ____ -16- -16- Other claims made by appellants are properly presented but seem to us hopeless on the facts (e.g., that perjured ____ testimony was knowingly presented) or the law (the claim that section 922(g)(1) is unconstitutional). Scarborough v. ___________ United States, 431 U.S. 563 (1977) (discussed in United ______________ ______ States v. Lopez, 115 S. Ct. 919 (1995)). ______ _____ The case for appellants here has been well presented by counsel, and we understand the practical pressure on lawyers- -especially in criminal cases--to resolve doubts in favor of including doubtful claims along with stronger ones. But cases with difficult issues now crowd the dockets. At least in opinion writing, the court's time is best reserved for colorable claims. Cf. McIntosh v. Antonio, 71 F.3d 29, 37 ____________ _______ (1st Cir. 1995). Finally, Bennett moved earlier under Fed. R. App. P. 28(i) to incorporate Lussier's brief generally as to "those facts, issues and arguments . . . that may inure to [his] benefit" and to adopt particular arguments in Lussier's brief. The motion, previously denied subject to reconsideration, is effectively moot since none of Lussier's claims have been accepted. But future counsel using Rule 28(i) should be aware of the need to connect the arguments adopted with the specific facts pertaining to the movant. United States v. Saccoccia, 58 F.3d 754, 763-64 (1st Cir. _____________ _________ 1995). -17- -17- Affirmed. ________ -18- -18-