UNITED STATES of America, Plaintiff,

v.

James ("Jimma") HOULIHAN, Defendant.

**Cr. No. 95–10378–NG.**

United States District Court, D. Massachusetts.

July 3, 1996.

Opinion Denying Reconsideration July 24, 1996.

Peter B. Krupp, Federal Defender Office, Boston, MA, for Defendant James Houlihan.

Frank A. Libby, Jr., Paul V. Kelly, United States Attorney's Office, Boston, MA, for U.S.

## MEMORANDUM ON GOVERNMENT'S COMPLIANCE WITH JENCKS ACT OBLIGATIONS

GERTNER, District Judge.

The defendant is charged under 18 U.S.C. § 1513 with killing Patrick Nee with intent to retaliate for Nee's mother's and sister's cooperation and testimony in *United States v. John Houlihan, et al.*, Cr. No. 93–10291–WGY (*Houlihan I*). Had the case been brought in state court, the government would have had to prove the elements of first degree murder. Having opted to bring this case in federal court under § 1513, the government has taken on an additional burden—proving not only the elements of first degree murder, but also the element of intent to retaliate.

Marie Boyden Connors testified to having overheard Jimma Houlihan threaten her brother, Patrick Nee, using words that are significant in this case. Houlihan, she says, said that the Boyden–Nee family were "finks," that his family had killed Nee's half-brother and stepfather, and that Nee "was next." The conversation took place after *Houlihan I*. In addition, Ms. Connors testified that she had reported this conversation to Paul Kelly, the Assistant United States Attorney in this case. Ms. Connors' testimony is critical. It purports to describe an inculpatory statement of the defendant, overheard by this witness. It is direct evidence of retaliatory intent, indeed, among the only direct evidence of retaliatory intent presented by the government.

Defense counsel received no Jencks Act[1] material on this statement. Marie Boyden Connors was not brought before the grand jury to testify concerning Houlihan's alleged threat. Threats made by Jimma Houlihan against Patrick Nee were mentioned in an affidavit in support of a search warrant in this case, but in an inadmissible form—to the effect that Nee had reported threats from Houlihan to his family members.[2]

The first notice defense had that the defendant's statement was directly overheard by Ms. Connors was in a report summarizing the evidence to be given by the witness, a report which the government produced at the request of the Court.[3] During cross examination, defense counsel, Peter Krupp, probed whether Ms. Connors had ever reported Houlihan's threat to anyone else, believing, based on the record before him, that she had not. At that point, the witness testified that in fact she had reported these threats to Mr. Kelly, the prosecutor.

Defense cries foul because they had no advance notice that Connors had related Houlihan's threat to Mr. Kelly and because, in the absence of Jencks or grand jury materials, they suspected Connors' account was a

---

1. 18 U.S.C. § 3500 *et seq.*

2. Detective Barnicle, who signed the affidavit, stated that Patrick Nee reported to members of his family that he had received several threats from Jimma Houlihan, to the effect that he and his family were a bunch of "finks", that his (Houlihan's) family were responsible for killing two other members of his (Nee's) family, and that he (Nee) "was next." AUSA Kelly drafted the affidavit.

   Obviously, testimony of family members concerning what Nee told them about Houlihan's threats would have been hearsay and presumptively inadmissible.

3. A central question raised early in this prosecution concerned how much of the detail of *Houlihan I* would be introduced in this proceeding.

The government uses the *Houlihan I* facts—the fact of the cooperation of the Boyden–Nee family, that Houlihan knew of it directly since he attended at least some of the trial and since it was well publicized—as part of its proof of retaliatory intent. At the same time, the defense was concerned that if too many of the details of *Houlihan I* were introduced it would prejudice the defendant in this case, running the risk that the jury will convict solely because the defendant is related to the principles in the previous case. Accordingly, I asked counsel for the government to prepare summaries of the testimony of witnesses conveying the facts of *Houlihan I*, so that the issue could be pre-tried.

recent contrivance. They sought any and all internal government documents relating to Connors' testimony. The government has submitted certain materials to me, described below.

The record suggests that there were several occasions when discoverable material might have been generated—but was not. And when the government finally gave notice of the statement, it was in the form of a summary memo, not in a form that could form the basis of cross examination.

**First,** according to AUSA Kelly, Ms. Connors called him often after *Houlihan I* and before Patrick Nee was killed, relating threats that she and her family were receiving, including the threat she directly overheard which was the subject of the trial testimony. None of these calls was reduced to writing.

**Second,** in November of 1995, after Nee was killed, Mr. Kelly interviewed Ms. Connors. At this time, federal and state authorities were conferring to determine whether Nee's murder would be prosecuted by state or federal authorities. After this interview, Connors' statements were recounted in what Mr. Kelly characterized as an evaluative memo prepared for the United States Attorney's office as part of its decisionmaking process with respect to prosecution—a document which, so characterized, was not discoverable. The November 1995 memorandum, with certain evaluative material excised, is attached as Exhibit A.

**Third,** shortly before the trial began in June of 1996, Mr. Kelly produced a summary of Ms. Connors' expected testimony at the request of the Court. (See n. 3, *supra* ). This was the only such document produced by the government regarding Connors' testimony. The government contends that since it provided this document as a "courtesy" to the Court, it was not intended as a verbatim accounting of Ms. Connors' earlier statements to the government. As such, it was of dubious cross examination value. That memorandum is attached as Exhibit B.

Somehow, someway, in this federal murder prosecution, no materials were provided to the defense as to a central statement of the defendant in a form that could provide the basis for cross examination.

There is no issue with respect to the first interview with Ms. Connors. There was no pending charge, let alone a pending federal charge. Mr. Nee was still alive. As to the summary proffer, produced on the eve of trial, it was produced at the Court's request, and was not required either under Jencks or as exculpatory evidence under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

The second statement, given on November of 1995 is more troubling. Mr. Nee had been killed at the end of July 1995. While Mr. Kelly reports that he interviewed Ms. Connors at a time when the federal and state authorities were determining which sovereign would bring these charges, there was a sitting federal grand jury investigating the matter, the defendant's home had been searched, and he had been arrested.[4]

In November 1995, Mr. Kelly was interviewing a crucial witness, the sister of the victim, Ms. Marie Boyden Connors. He could have set up this interview with an agent, taking down a verbatim account of what Ms. Connors said. It would not have been particularly difficult. Connors' account of Houlihan's threat was a short statement. There was no problem with recounting it accurately. Instead, Mr. Kelly chose to record the interview in a form that would not be available to the defendant and, if the Court had not taken the unusual step of requesting an outline of *Houlihan I* testimony, would likely have remained unavailable.

The law is clear that, absent bad faith, there is no affirmative obligation on the part of the government to take notes. *Campbell v. United States,* 296 F.2d 527, 531 (1st Cir. 1961), *supplemented,* 303 F.2d 747 (1st Cir. 1962), *vacated on other grounds,* 373 U.S. 487, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1963); *United States v. Lieberman,* 608 F.2d 889, 897 (1st Cir.1979), *cert. denied,* 444 U.S. 1019, 100 S.Ct. 673, 62 L.Ed.2d 649 (1980). There may well be many reasons why the government would not take notes—witness

---

4. He was indicted on December 5, 1995.

security issues, the rapid pace of the investigation, the difficulty of separating out evaluative comments from admissible evidence. At the same time the law is clear that the government may not destroy notes already made where those notes are arguably Jencks. *United States v. Mannarino,* 850 F.Supp. 57 (D.Mass.1994).

Nevertheless, these two poles—no obligation to take notes, an obligation not to destroy notes already taken—cannot define the universe of Jencks' obligations. The entire Jencks scheme would be meaningless if the government—for no legitimate reason—could avoid generating discoverable material, particularly where that material concerns a central witness, testifying about a defendant's statement. While Jencks does not require law enforcement agents "always to take notes, so that a record might be there to be kept," *Campbell v. United States,* 296 F.2d at 531, it surely assumes that advocates acting in good faith will record statements regularly, and as accurately as possible in order to preserve them for trial. The disclosure scheme would be a nullity if the government regularly evaded it by simply making no effort to record the statements accurately, littering the memorandum with its mental impressions and observations, taking down facts in a "summary fashion" or taking no notes whatsoever.

I do not intend by this to suggest that courts should second guess the government each and every time it reports that there was no material on a given subject. This case however stands out in a number of respects. The evidence concerns the central witness, the central admission on retaliatory intent, in a case involving extraordinarily high stakes.

The defense had no information about this admission until a few weeks before trial and then, only in a summary form, in response to the Court's special request.

Indeed, the government's arguments suggest that it would not have disclosed the statement at all, had the court not called for a summary pleading to determine how much of *Houlihan I* would be introduced. The government takes the position that Connors' November 1995 statement was not "signed or otherwise adopted or approved by the witness" 18 U.S.C. § 3500(e)(1), nor did it constitute a "substantially verbatim recital" of the witness's statements during the interview. 18 U.S.C. § 3500(e)(2).[5]

Moreover, the government's treatment of Connors' statements was not an isolated incident. In its *Brady* and *Giglio* [6] submission, the government presented information about two significant witnesses in "summary form." [7] Defense counsel would then seek to cross examine the witness based on apparent discrepancies with the "summary" pleading. On at least two occasions, AUSA Libby or Kelly came forward at sidebar and said that they had erred in their reporting and that the witness' version on the stand was correct. The net effect was that the defense counsel had to cross examine a moving target.[8]

Criminal discovery is not, nor should it be, the game of hide the ball. The stakes are too high to both sides.

I find that the government has failed to comply with Jencks in good faith. It has, for no legitimate reason, failed to produce critical evidence in a discoverable and admissible form.

5. Each time defense counsel sought to cross examine based on the summary memo, the government objected because these were not "verbatim" statements.

6. *See Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

7. One witness was Daniel Bowden, who related that the defendant admitted killing Patrick Nee on at least two occasions. The other witness was John Schurko who claimed to have witnessed the defendant chasing a mortally wounded Patrick Nee.

8. To be sure, the discrepancies were minor. Accordingly, I permitted the defense to use these summary memos to cross examine the witness, although alerting the jury to the fact that these were not verbatim reports adopted by the witness. If the discrepancies had been more substantial, they would have raised the possibility that one of the prosecutors who had heard the inconsistent report would be obliged to take the stand. The government takes that risk when its attorneys interview witnesses directly, without the presence of an agent.

I also find that the November 1995 report, with the evaluative materials excised, does meet the standards of 18 U.S.C. § 3500(e)(2). It recounts very simple information in a "substantially verbatim" fashion, notwithstanding the government's characterization.

■ The remedy is the production of Mr. Kelly's November 1995 memorandum.[9] Since the account of Ms. Connors' statement in the November 1995 memorandum was substantially identical to her account at trial, I find that the defense has not been prejudiced by the failure to produce it earlier.[10]

■ Moreover, the defendant's concerns—about cross examining the witness blind, wrongly assuming based on the materials received that she had not reported the Houlihan threat to law enforcement, when she apparently had—were remedied by the instruction which it requested immediately after the Connors' testimony, to which the government did not object. I instructed the jury that Connors' statement at trial with respect to Houlihan threats before Nee's death had not been reflected in any formal written memorandum.

**SO ORDERED.**

*MEMORANDUM RE: GOVERNMENT'S MOTION TO RECONSIDER MEMORANDUM ON GOVERNMENT'S COMPLIANCE WITH JENCKS ACT OBLIGATIONS*

On July 3, 1996, during the trial of *United States v. James ("Jimma") Houlihan*, I found that the government had failed to com-

---

**9.** This case is unlike the case presented before the Court in *United States v. Mannarino*, 850 F.Supp. 57 (D.Mass.1994) where the Jencks material had been destroyed and thus the government was wholly unable to meet its obligations. *Mannarino*, 850 F.Supp. at 60.

**10.** Defendant claims prejudice based on the fact that his counsel cross examined the witness without knowing that she had in fact reported the Houlihan threat to AUSA Kelly before the Nee slaying. The government said that it was counsel's fault for asking a question to which he did not know the answer. Defendant says that he reasonably relied on the summary memo given to him just before the trial and assumed that had there been an earlier encounter, it would have been recorded.

ply with its obligations under 18 U.S.C. § 3500 (the "Jencks Act") when it did not produce a November, 1995 document recounting its interview of Marie Boyden Connors, the sister of the victim in this case. (*See* Memorandum on Government's Compliance with Jencks Act Obligations.) I based that finding on two grounds: First, the circumstances surrounding the generation of the document was troubling, because the government, having the option to record this critical interview in a way that would clearly make it available to the defense under Jencks, chose not to do so. Second, I found that, notwithstanding the government's choice, the November, 1995 report, with certain evaluative materials excised, should have been produced because it met the standards of the Jencks Act, 18 U.S.C. § 3500(e)(2).

The government has moved for reconsideration of my July 3, 1996 ruling. It has pointed out what it characterized as factual errors in the decision which, it contends, cast doubt on the Court's conclusions. Moreover, the government contends that the Court's decision is inconsistent with the holdings of *Palermo v. United States*, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959) and *United States v. Bennett*, 75 F.3d 40 (1st Cir.1996).

The government's motion for reconsideration is **DENIED**. The facts with which the government takes issue do not affect the underpinnings of the decision; nor is the decision inconsistent with the teachings of either *Palermo* or *Bennett*.

The Government's Motion for Reconsideration mistakes the forest for the trees. The

Both sides are right to a degree. Defense ought to have been more careful in relying on the summary memo. It was apparent that the memo was relating the facts in a general, not verbatim way. At the same time, as a general matter, the defense should have been able to assume that by the time of trial critical information would have been revealed to them.

Still, even if the prosecutors had produced the November 1995 statement in a discoverable form under Jencks, there is no guarantee that it would have also recounted the fact that the statement had been made to AUSA Kelly at an earlier time. Discovery—even when it is implemented in good faith—cannot eliminate all surprises.

Court focused on the significance of what the government had not produced; the government's response was a litany of what it had produced, which, although important to provide context to the decision, did not address the Court's concerns, as a matter of law or fact.

What the government had not produced in discoverable form [1] was the statement of Marie Boyden Connors that she had overheard Houlihan threaten her brother, linking that threat to the Boyden family's participation in *Houlihan I.*[2] Marie Boyden Connors' statement was the centerpiece of the government's case on retaliatory intent. That fact, coupled with the fact that the government had chosen to memorialize the statement in such a form as to avoid disclosure to the defense, was the centerpiece of the Court's conclusion that the government had not complied with the Jencks Act.[3]

The ruling stands that there has not been adequate compliance with The Jencks Act, that the November, 1995 memorandum should be turned over.

Nevertheless, in the light of the pleadings on reconsideration I make the following additional findings:

█ The purpose of the Jencks Act was to preserve the defendant's right to obtain access to materials which would aid in impeaching government witnesses. S.Rep. No. 981, 85th Cong., 1st Sess., reprinted in 1957 U.S.Code Cong. & Admin.News 1861, 1862. At the same time, because of the apparent excesses that had followed *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1959), Congress was also concerned with protecting government witnesses from unfair examination, and protecting the work product of government attorneys from unfair disclosure. (*See United States v. Snell,* 899 F.Supp. 17, 21 n. 6 (D.Mass.1995). Congress,

attempting to strike a balance between these concerns, concluded that only those statements which could properly be called the witness' own words should be made available to the defense, without distortion. *Palermo v. United States,* 360 U.S. at 352, 79 S.Ct. at 1224. Distortion could come about through "selectivity" in the recording of only a portion of a witness' statement, or the advertent or inadvertent "infusion of the recorder's opinions." *Id.*

Thus, the requirements of the Jencks Act protect the interests of *both* the defendant and the government. To the defendant, they enable him to effectively confront and cross examine the witness, interests which have constitutional dimension. *See Palermo v. United States,* 360 U.S. at 361, 79 S.Ct. at 1229 (1959) (Brennan, J. concurring).[4] To the government, they enable its witnesses to be confronted fairly, not with out of context quotes, and they preserve the confidentiality of counsel's work product.

Accordingly, clause (e)(1) permits the production of "a written statement made by ... [a] witness and signed or otherwise adopted or approved by him ..." Clause (e)(2) widens the definition to include a "stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the government and recorded contemporaneously with the making of such oral statement."

The government claims that the November, 1995 statement falls outside of either clause for two reasons—because it contains evaluative materials, is not substantially verbatim and was not adopted by the witness, and because of the circumstances under which it was prepared. With regard to the latter, AUSA Kelly wrote the memorandum from memory, the day after his interview

---

**1.** By "discoverable form," I mean the form which the Jencks Act requires before the government is obliged to produce the material.

**2.** Houlihan, she says, said that the Boyden–Nee family were "finks," that his family had killed Nee's half-brother and stepfather, and that Nee "was next."

**3.** As noted in the July 3, 1996 Memorandum, Assistant United States Attorney Paul Kelly met

with Ms. Marie Boyden Connors when federal and state authorities were conferring to determine which sovereignty would prosecute Nee's murder.

**4.** Witness statements required to be produced under Jencks may then be used as prior inconsistent statements under Fed.R.Evid.Rule 613.

with Marie Boyden Connors. The government cites specifically to the language in *Palermo* that "summaries of an oral statement ... which were prepared after the interview without the aid of complete notes, and hence rest on the memory of the agent, are not to be produced." *Palermo*, 360 U.S. at 353, 79 S.Ct. at 1225. The government argues that it could not be in bad faith, as the Court found, since *Palermo* and subsequent decisions reject the claim that the government has any obligation to record its interviews contemporaneously, and in discoverable form (either adopted by the witness or "substantially verbatim" format). Moreover, the government contends that its good or bad faith has to be put in context, given what it suggests is the substantial information that it has already turned over to the defendant.

With regard to the form of the memo, the government also claims that it was not proper to characterize the November, 1995 memo as a "substantially verbatim statement" meeting the requirements of ¶ (e)(2). To do so, according to the government, is to run afoul of *United States v. Bennett*, 75 F.3d 40, 47 (1st Cir.1996) in which the Court stated that the defense cannot take a "simple statement" out of the context of the whole interview and suggest that because of its brevity, it is "substantially verbatim" and thus discoverable.

The government mistakes the application of these cases to the facts at bar. On the timing of the memorialization of a witness interview, the Court in *Palermo*, in the sentence following the quoted statement (about oral summaries prepared after the interview), noted that it was not expounding a standard of a "delusive exactness." *Palermo*, 360 U.S. at 353, 79 S.Ct. at 1225. The Court then went on to expressly recognize the role of the district court in separating the wheat from the chaff:

> The possible permutations of fact and circumstances are myriad. Trial courts will be guided by the indicated standard, in-

formed by fidelity to the congressional purposes we have outlined.... Since we feel the statutory standard has guiding definiteness, it would be idle to attempt a minute enumeration of particular situations to which it is to be applied. Such a vain attempt at forecasting myriad diversities with minor variance is as futile and uncalled for in this as in so many areas of the law. That is what the judicial process is for—to follow a generally clear direction in dealing with a new diversity as it may occasionally arise.

*Palermo*, 360 U.S. at 353, 79 S.Ct. at 1225.

Moreover, nothing in *Palermo* suggested that this Court should ignore whether the Jencks Act has been complied with in good faith. Justice Brennan, concurring in *Palermo*, underscored the fact that Jencks does not prohibit a district court from exercising its discretion to require the production of statements even arguably outside the scope of the statute where the "fair administration of criminal justice so demands." 360 U.S. at 363, 79 S.Ct. at 1230.[5] And he concluded:

> ... Congress made crystal clear its purpose [was] only to check extravagant interpretations of Jencks in the lower courts while reaffirming the basic holding that a defendant on trial should be entitled to statements helpful in the cross-examination of government witnesses who testify against him. Although it is plain that some restrictions on production have been introduced, it would do violence to the understanding on which Congress, ... passed the statute, if we were to sanction application of it exalting and exaggerating its restrictions, in disregard of the congressional aim or reaffirming the basic Jencks principle of assuring the defendant a fair opportunity to make his defense.

360 U.S. at 365, 79 S.Ct. at 1231.

Indeed, using words similar to those used by this Court in its July 3, 1996 Memorandum, Justice Brennan added:

---

**5.** Justice Brennan notes that until the Conference report, the Jencks legislation contained a provision making its terms exclusive, language then deleted in Conference. Indeed, the purpose of Justice Brennan's concurrence in *Palermo* was to underscore the fact that the principal opinion did not strip the trial judge of his or her discretion to order production when the fair administration of justice so required. 360 U.S. at 363, 79 S.Ct. at 1230.

*Examination of the papers so sedulously kept from the defendant in this case ... does not indicate any governmental interest, outside of the prosecution's interest in conviction, that is served by non-disclosure, and one may wonder whether this is not usually so. There inheres in an over-rigid interpretation and application of the statute the hazard of encouraging a practice of government agents' taking statements in a fashion calculated to insulate them from production.* I am confident that the District Courts will bear all these factors in mind in devising practical solutions to the problems of production in the many areas which cannot fairly be said to be determined by the affirmance of the judgment in this case.

360 U.S. at 365–66, 79 S.Ct. at 1231. (Italics supplied).

In a very similar vein, in my original decision, I noted that the

entire Jencks scheme would be meaningless if the government—for no legitimate reason—could avoid generating discoverable material, particularly where that material concerns a central witness, testifying about a defendant's statement. While Jencks does not require law enforcement agents "always to take notes, so that a record might be there to be kept [citing *Campbell v. United States,* 296 F.2d 527 (1st Cir.1961), *supplemental,* 303 F.2d 747 (1st Cir.1962) vacated on other grounds, 373 U.S. 487, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1963) ], it surely assumes that advocates acting in good faith will record statements regularly, and as accurately as possible in order to preserve them for trial. The disclosure scheme would be a nullity if the government regularly evaded it by simply making no effort to record the statements accurately, littering the memorandum with its mental impressions and observations, taking down facts in a 'summary fashion' or taking no notes whatsoever.

▮▮▮▮ Consistent with the spirit of *Palermo,* in both its main and concurring opinions, subsequent case law reaffirmed the view that

*Palermo*'s holding was not to be applied mechanistically. Among the factors to be taken into account in ordering the production of a statement recorded from memory is the extent to which it conforms to the language of the witness, *United States v. Stromberg,* 268 F.2d 256, 273 (2d Cir.) *cert. denied* 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959) (proper to refuse production of report that was in investigator's language, covered eight months' worth of statements and was never shown to the witness); *cf. United States v. Waldman,* 159 F.Supp. 747, 749 (D.N.J.1958) (disclosure of statement that gave the substance of what the witness said in substantially the words of the witness), the length of the written statement in comparison to the length of the interview, *Palermo,* 360 U.S. at 355, 79 S.Ct. at 1226 (a 600 word summary of a 3½ hour conference was not "virtually verbatim"), and the lapse of time between the interview and its transcription. *Id.* at 352–53, 79 S.Ct. at 1224–25. As the Court noted in *United States v. McKeever,* 271 F.2d 669, 675 (2d Cir.1959):

the statute must be interpreted with a mind to the fact that only a substantially verbatim, not a precisely verbatim, recital of a witness' pretrial oral statement is required; and the recording made of this statement—of which the document sought may be either the original or a "transcription"—need be only contemporaneously, not simultaneously made." [6]

In the light of this case law, I make the following findings to supplement the July 3, 1996 Memorandum:

1. The November, 1995 interview with Marie Boyden Connors was not the first time that she had communicated with Mr. Kelly with respect to the comments she claimed to have overheard from Mr. Houlihan. According to Mr. Kelly, she had reported these threats to him in March of 1995, but he had not written them down (nor was he required to do so). (See July 3, 1996 Memorandum, *supra* p. 4). The timing of this interview was critical. It was in the middle of the federal grand jury proceedings in this case. Mr.

---

**6.** See generally, 2 Charles Alan Wright, 2 Fed. Prac. & Proc.Crim.2d section 437 (R. 26.2)  (1982).

Kelly represented that the government was in the process of determining which sovereignty, state or federal, should pursue the matter. Federal prosecution hinged on the finding of retaliatory intent within the meaning of 18 U.S.C. § 1513, and thus, the significance of Marie Boyden Connors' statements was paramount.

It is not unreasonable to believe that the November, 1995 interview was precisely for the purpose of having the witness confirm the statements she had previously communicated to Mr. Kelly. Had that occurred, and there is reason to believe it did, it would be the kind of statement which must be turned over under Jencks.[7]

2. While there is no time specified on the record, given the content of the November, 1995 memo, it is fair to assume that the interview took a relatively short time. Even though Mr. Kelly represented that he had memorialized the conversation the next day, that process hardly runs the same risks as described by the Court in *Palermo,* when the danger of out of context reporting was engendered by the fact that the officer was recording his memory of an interview that had taken over three and one half hours. *Palermo,* 360 U.S. at 355, 79 S.Ct. at 1226. The fact that Mr. Kelly waited a day to memorialize a short interview, with a witness with whom he had already spoken, essentially for the purpose of determining if she adopted her earlier reporting of threats, should not stand in the way of a determination that this is essentially Jencks Act material.

3. This ruling does not run afoul of *Bennett.* It does not involve taking a simple statement from an otherwise complex recitation as in *Bennett.* The entire interview was short and largely focused on that statement.

4. My conclusion that the production of the November, 1995 Marie Boyden Connors memo is required is unaffected by the government's recitation of the materials it has produced to the defense.[8]

The government noted that its *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) submissions on two of the principal government witnesses were not limited to summary presentations. The Court did not mean to so suggest. Notwithstanding what was turned over, statements were made to the prosecutors on the eve of trial that were not memorialized in any form but in the summary memo. Then, when the witness testified in a way inconsistent with the summary memo, the government represented that it was its error in relating the interview.

The problem underscores the problems with which the Jencks act was concerned, namely the production of statements that are either adopted by the witness or substantially verbatim, and thus, able to be used, if necessary, as prior inconsistent statements under Rule 613, Fed.R.Evid. It also underscores the difficulties with which this opinion and its predecessor were concerned—namely, the problems engendered by the government's decision to memorialize an interview in such a way as to avoid disclosure under Jencks, when it could have made a different choice. Here the government chose to have the AUSA interview a witness directly, without agents present to take notes, and record

---

7. The fact that the statement was made to a government lawyer is obviously irrelevant. In an analogous situation, the court in *Saunders v. United States,* 316 F.2d 346, 350 (1st Cir.1963) noted:

> If a government attorney has recorded only his own thoughts in his interview notes, the notes do not fall within the statutory definition of a 'statement.' In contrast, if he has made only a substantially verbatim account of the interview, the notes *are* open to inspection. If the notes contain both verbatim remarks of the witness and personal observations of the attorney, the judge must inspect and excise the impressions.

This is precisely what the Court did in the instant case.

8. It is interesting that on March 4, 1996, the defense filed a Motion for Disclosure of Statements Made By Patrick Nee That the Government Intends To Introduce in its Case in Chief, seeking statements like the Marie Boyden Connors statement. A week later, the government filed an opposition (entitled Government's Opposition to Defendant's Motion for Disclosure of Statements Made by Patrick Nee) citing to the fact that the rules provide for the disclosure of statements only in connection with potential motions to dismiss.

it in a summary memo, without direct quotes. In the future, if there are material discrepancies between the witness' account and the memory of the AUSA, the government takes its chances that a member of its prosecution team will be called to testify.[9] Clearly, the better practice for both prosecution and defense, is to record statements in Jencks form and produce them. Rather than undermining this Court's conclusions with respect to the Marie Boyden Connors memo, it provides additional support for them.

Therefore, the Government's Motion for Reconsideration is **DENIED**.

**SO ORDERED.**

---

9. The government also represents that the summary memorandum which included Marie Boyden Connors' statement, was not one the Court directed it to produce. Rather it contends, this statement was part of a memorandum it would have produced anyhow. The record is confused on this point. The defendant pointed to a portion of the transcript which provided the basis for the Court's belief that the Marie Boyden Connors' memo was produced in response to this Court's urging. If the government intended to produce the summary memo without the Court's request, that is to be encouraged and lauded. It does not, however, affect the Court's conclusions on the November, 1995 memo.