MEMORANDUM
 

 WOLF, District Judge.
 

 This memorandum is based upon the transcript of the decision rendered orally on January 21, 2000, allowing defendant Boubacar Diabate’s motion to dismiss without prejudice. This memorandum adds citations, deletes some colloquy, and clarifies some language.
 

 For reasons that I will describe orally, this case is hereby dismissed without prejudice.
 

 My preference would have been to write more carefully and thoroughly about this matter. However, this is the paradigm that was described in the Report of the Judicial Members of the Committee Established to Review and Recommend Revisions of the Local Rules of the United States District Court for the District of Massachusetts Concerning Criminal Cases (October 28, 1998) at 8. As stated in that Report:
 

 cases too often get to trial without legally required discovery being provided. Such problems present judges with challenging issues to be resolved promptly, and threaten both the fairness of the trial and the finality of any conviction.
 
 See, e.g., United States v. Walsh,
 
 75 F.3d 1 (1st Cir.1996);
 
 United States v. Osorio,
 
 929 F.2d 753 (1st Cir.1991);
 
 United States v. Devin,
 
 918 F.2d 280 (1st Cir.1990);
 
 United States v. Mannarino,
 
 850 F.Supp. 57 (D.Mass.1994).
 

 Essentially, the reasons for this decision and the facts on which it is based are as follows. The government has violated certain discovery obligations to the defendant, which are described in Local Rules 116.8 and 116.9 of the Local Rules of the United States District Court for the District of Massachusetts. The pertinent Local Rules essentially clarify and codify discovery obligations that exist under the United States Constitution and the Federal Rules of Criminal Procedure.
 

 
 *142
 
 Local Rule 116.8 requires members of the United States Attorney’s Office “to inform all federal, state, and local law enforcement agencies formally participating in the criminal investigation resulting in the ease of the discovery obligations that are set forth in the Local Rules.” Local Rule 116.8 also requires the United States Attorney’s Office to obtain any information subject to disclosure from each agency participating in the investigation that resulted in the case. The Supreme Court reminded prosecutors of that obligation in
 
 Kyles v. Whitley,
 
 514 U.S. 419, 437-38, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). As the Supreme Court stated, “the individual prosecutor has a duty to learn any favorable evidence known to others acting on the government’s behalf in the case, including the police.”
 
 Id.
 
 at 437, 115 S.Ct. 1555.
 

 Local Rule 116.9 requires agents participating in an investigation to maintain, among other things, all “contemporaneous notes ... memorializing matters relevant to the charges contained in the indictment.” As the Supreme Court held in
 
 Kyles,
 
 it is the duty of prosecutors to obtain and review information in the possession of investigators to determine whether any of it is discoverable.
 
 Id.
 
 at 437-38, 115 S.Ct. 1555.
 

 Prosecutors are required to disclose to defense counsel all exculpatory information, including information that cumulatively is material.
 
 Id.
 
 Such information includes information that affects the credibility of proposed government witnesses.
 
 United States v. Bagley,
 
 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).
 

 In this case, all such exculpatory information was ordered to be disclosed no later than January 10, 2000, in anticipation of a January 18, 2000 trial. In fact, at the pretrial conference on January 5, 2000, the government represented that all exculpatory information had been turned over much earlier, in part in response to the requirements of Local Rule 116.2(B) and in part because of the “open file” discovery that the government said that it was employing in this case. Nevertheless, I ordered that anything that had not been made available be disclosed by January 10, 2000. However, as the government understood, the exculpatory information now at issue should have been turned over many months ago.
 

 In this case, none of the three Assistant United States Attorneys who have represented the government advised the agents or agencies participating in the investigation, the United States Secret Service and the Fall River Police Department, of the obligation to keep their notes rather than destroy them.
 

 The prosecutors also did not until an Order was issued yesterday, January 20, 2000, review any materials from the Fall River Police Department. They have reviewed no notes taken by members of the Fall River Police Department because those notes were improperly destroyed.
 

 In addition, until Monday, January 17, 2000, the Secret Service did not provide the prosecutors with certain documents seized from the defendant’s apartment which are highly relevant and helpful to his defense, particularly the rental agreements purporting to have his signature on them that were admitted as Exhibits 1 and 2 on January 20, 2000. Those documents were only discovered by the United States Attorney’s Office because last Friday, January 14, 2000,1 ordered the government to look for Secret Service Agent Paul Weare’s notes, because defense counsel indicated that grand jury testimony suggested that such notes existed, but had not been produced.
 

 But for defense counsel’s alertness in raising the issue, and my ordering that effort over a three-day weekend, documents very valuable to the defendant would not have been disclosed to him. As it is, they were not disclosed in a manner that gives the defendant an adequate opportunity to do the investigation that
 
 *143
 
 would be reasonably necessary to use those documents to the maximum effect or to determine whether there are witnesses who could be called to enhance the value of those documents to the defense. Those documents were not produced to the defendant until January 18, 2000 the day the jury was selected in this case, which was a busy day.
 

 I find that Agent Weare’s written reports do not include everything that was in his notes. His testimony that they do is not credible. He clearly and admittedly did not include in his reports all of the information reflected in notes taken by Fall River Police Officer Forcier. In addition, Mr. Weare withheld from the prosecutors and the defendant information that is highly helpful to the defendant.
 

 In the circumstances, I am not persuaded that there was not exculpatory information in the notes, including statements that could be used to impeach witnesses, such as Mr. Weare, and/or substantive evidence helpful to the defense.
 
 See United States v. Del Toro Soto,
 
 728 F.2d 44, 48 (1st Cir.1984). Moreover, the government has not proven that the defendant has not been prejudiced by the destruction of the notes, and by the delayed disclosure of Exhibits 1 and 2 and 3, the rental agreements introduced on January 20, 2000.
 

 For example, with regard to the rental agreements, capable defense counsel would ordinarily try to find the recipient of the documents and ask whether he or she observed them being signed. If it turned out that Boubacar Diabate signed his name on Exhibits 1 and 2 in that person’s presence, his or her testimony would be highly helpful to the defendant because those signatures plainly differ from the signature on the allegedly forged check. The Local Rules are intended to give counsel an adequate opportunity to conduct the investigation that is necessary to represent defendants effectively and, in view of reciprocal discovery, to provide the government a comparable opportunity to investigate after documents are disclosed by the defense.
 

 Producing the documents the day a jury is impaneled in a case which the government represents will take about three days to try is just not fair. Moreover, it is fraught with the potential for prejudice that I have not been persuaded does not actually exist in this case.
 

 In this case, in contrast to some others, time is of the essence. The jury was selected. Recognizing that there were outstanding issues, however, I did not have the jury sworn before we recessed three days ago.
 

 I was told, as I said, that the trial was likely to take about three or maybe four days. It is urgent that the trial be conducted. I have considered whether a continuance would be appropriate. It is not.
 

 If the defendant is convicted on Count 2, which relates to his own alleged conduct, the government claims that the Sentencing Guidelines are eight to fourteen months. The defendant has already been detained for more than eight months. It is, in any event, uncertain whether he will be convicted at all.
 

 If the defendant is convicted on Count 1, the conspiracy charge, the government contends that the Guidelines may possibly be as high as twelve to eighteen months. However, to prove that is the Guideline range, the government would not only have to obtain the defendant’s conviction concerning the alleged conspiracy, but also prove that he is personally responsible for the amounts of money involved in the checks allegedly handled by his coconspirators. It is, under the Guidelines, possible that he could be convicted of conspiracy, but not held accountable for that full amount involved in it, because the government would have to prove both that the full amount was in furtherance of the jointly undertaken criminal activity and reasonably foreseeable to him.
 
 See
 
 U.S.S.G. § 1B1.3, A.N.2;
 
 United States v. Patriarca,
 
 912 F.Supp. 596, 604-10 (D.Mass.1995).
 

 
 *144
 
 In addition, the failure of the United States Attorney’s Office and federal investigative agencies to satisfy their discovery obligations are unfortunately part of a long pattern. Judge Douglas Woodlock described that pattern as it existed in 1994 in his decision in
 
 United States v. Mannarino. See
 
 850 F.Supp. at 71-2. Judge Wood-lock recounted a dismal history of problems and noted that
 
 Mannarino
 
 presented “yet another example of concerted indolence in pursuing disclosure by the United States Attorney’s Office and a willful blindness to the failure of its agents who had disclosure duties to fulfill them.”
 
 Id.
 
 at 71. Discovery violations do not occur in every case. However, as Judge Woodlock described, the government has failed to perform properly in a disturbing number of cases, and problems have occurred after the government profusely apologized and promised that those problems would not recur.
 
 Id.
 
 at 71-2. Indeed, those problems prompted the United States District Court to review and revise its Local Rules relating to discovery in criminal cases.
 
 Id.
 
 at 71.
 

 The United States Attorney’s Office participated in that process. It did not prevail on all disputed issues, but it was fully engaged in the process that generated the new Local Rules. I believe that the United States Attorney and the head of his Criminal Division, among others, were fully familiar with the obligations described by the Local Rules and the purposes of them. As the government has recognized in its arguments, those Rules are laws and were violated in this case.
 
 See
 
 Fed. R.Crim.P. 57.
 

 Thus, this is a case that involves admitted violations of recognized rights. Those violations affect the integrity of judicial proceedings. As I sit here today, I do not feel that I can give the defendant, Bouba-car Diabate, a trial that will be both prompt and fair. That is a primary reason that this case is being dismissed. It is also appropriate to dismiss this case to deter future illegal conduct, although if I dismissed this case with prejudice, it would, perhaps, send a stronger message.
 

 Fundamentally, I have considered the matter and find that no sanction less than dismissal is both fair and feasible in the unique circumstances of this case. In other cases, I might grant a continuance. However, I have selected a jury. There are fourteen jurors who have been waiting for us for the last hour and fifteen minutes, having come in on a day when many school systems are closed because of snow.
 

 More significantly, the defendant is detained pending trial. As indicated earlier, it may be that he will not be convicted and, if he is convicted, he may not be sentenced to more time than he has already served. Moreover, when he is released from custody in this case later this morning, he is still going to be detained by the Immigration and Naturalization Service.
 

 Given all the facts I have described, I do not consider precluding Agent Weare from testifying sufficient to reasonably assure a fair trial. I do not know what was in the notes that were improperly destroyed by the Secret Service and by the Fall River Police Department.
 
 See Goldberg v. United States,
 
 425 U.S. 94, 111, n. 21, 96 S.Ct. 1338, 47 L.Ed.2d 603 (1976) (“Since courts cannot speculate whether [Jencks material] could have been utilized effectively at trial, the harmless error doctrine must be strictly applied in Jencks Act cases.”);
 
 Del Toro Soto,
 
 728 F.2d at 48.
 

 Moreover, in the past, sanctions short of dismissal have not sufficed to deliver the message to the government and cause it to prevent misconduct concerning discovery from recurring.
 

 In addition, dismissal of this case will not put an allegedly dangerous individual back on the street, where he might threaten the community. This is not a case in which the defendant is charged with a violent crime or drug trafficking. In addition, he is not going back on the street. He is going to be detained by the Immi
 
 *145
 
 gration and Naturalization Service and is subject to deportation.
 

 Finally, the defendants has already served eight months in prison on a charge that might never be proven. The government has recognized that this is a competitive case.
 

 More specifically, some of the relevant facts on which this decision is based are as follows.
 

 This case arises out of an investigation that was conducted by the Secret Service, an agency of the federal government, and the Fall River Police Department. For example, their agents conducted a number of interviews together. At times the Secret Service agent would take notes. At times the Fall River police officer would take notes.
 

 The case was first brought to the United States Attorney’s Office in April 1999. At that time, Agent Weare still had many, if not all, of the notes that have since been improperly destroyed.
 

 The defendant was arrested on a complaint in May 1999. The complaint alleged one count of possession and uttering of a forged and counterfeit check in December 1998. That is the charge that is now Count 2 of the pending indictment.
 

 In August 1999, a two-count indictment was returned. It charges the defendant with conspiring to possess and utter forged and counterfeit checks, and with possessing and uttering a forged and counterfeit check at the Fall River Savings Bank in December, 1998.
 

 The central issue in the trial that I thought was going to commence today is whether the defendant participated in the acts alleged. The government contends that he opened an account at the Fall River Savings Bank and subsequently deposited in that account an $18,000 check that the government claims is forged and counterfeit. No money was withdrawn from that account.
 

 Based on what I have been educated to understand during my involvement in this case in the past several weeks, after it was assigned to me following the recusal of Judge George O’Toole, the government may not be able to prove beyond a reasonable doubt the defendant’s participation in the conduct alleged. There is no witness who will identify him as ever being at the bank. The government has represented that the two bank employees who might be witnesses would not be asked if they could identify the defendant.
 

 In addition, as Agent Weare acknowledged, the defendant cannot be identified in the bank photograph as the person depositing the check in December 1998. In fact, as defense counsel argued, that photograph appears to be of a person much heavier than the defendant is now. There is also no fingerprint analysis indicating that the defendant handled the check or the application to open the account that would be offered as evidence. Nor is there any expert handwriting analysis indicating that the handwriting on the allegedly forged, counterfeit check is the handwriting of the defendant, Boubacar Diabate.
 

 The government has intended to ask Agent Weare if the signature of Boubacar Diabate on the application and the check appeared to be the same. It has been an open issue whether I would have permitted Agent Weare to respond to that question.
 
 See
 
 Fed.R.Evid. 701. However, it has definitely been the government’s intention to elicit that comparison from him if it could.
 

 Mr. Weare led the search of the defendant’s apartment the day that Diabate was arrested. The search was not conducted pursuant to a warrant. The government felt it did not have probable cause to obtain a warrant. However, consent to search was obtained, according to Agent Weare’s testimony, after the defendant was arrested and handcuffed.
 

 There has been no motion in this case to suppress the items seized based on a claim that the defendant’s consent was involun
 
 *146
 
 tary. However, as I said during oral argument, there may be a valid motion to suppress if this case is reindicted. The defendant is young, now 21 years old, and an alien. He was handcuffed at the time that he was asked if he • consented to the search. In the circumstances, a question would be presented whether in-the totality of the circumstances his consent was voluntary.
 
 See United States v. Mendenhall,
 
 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980);
 
 Schneckloth v. Bustamonte,
 
 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). However, that is not an issue that has been presented to me.
 

 In any event, in the course of the search directed by Agent Weare, the government seized three apartment rental applications, which were marked on January 20, 2000 as Exhibits 1, 2, and 3. Two of the applications have signatures of the name Bouba-car Diabate which, as the court quickly recognized and Agent Weare readily acknowledged, do not match the signatures on the Fall River Savings Bank application or the check that is the subject of Count 2 of the indictment.
 
 See
 
 Ex. 1 and 2. From a lay person’s point of view, the signature on the third application, Exhibit 3, may be similar to the signature on the application opening the bank accountant and the check that was deposited in December 1998.
 

 At a minimum, the three documents suggest that at times someone other than the defendant signed the name Boubacar Dia-bate to documents. More significantly, to the extent that it is believed that Exhibits 1 and 2 were signed by the defendant, Boubacar Diabate, they would raise serious doubt concerning whether he is the person who signed the application and the check at the heart of Count 2.
 

 I find that any competent Secret Service agent would have compared the signature on the rental applications to the Fall River Savings Bank application and the $18,000 check. Mr. Weare has been a Secret Service agent for seventeen years. I infer that he did that comparison. He produced to the Assistant United States Attorney seized documents with the signature of Boubacar Diabate that appeared to match the bank application and the check. He did not, until January 17, 2000, produce to the prosecutors the three rental applications which, taken together, are very helpful to the defendant.
 

 More specifically, Agent Weare turned over to the prosecutors a box with all of the other potential evidence obtained or seized in his investigation. He omitted only the three rental agreements.
 

 Assistant United States Attorney Timothy Feeley, the supervisor of what is called the Major Crimes Unit, told defense counsel that the box contained all of the evidence in the case, including all inculpatory evidence and all arguably exculpatory evidence. Defense counsel relied on this representation, which Mr. Feeley did not know was false.
 

 As I said, pursuant to the Local Rules, the government was ordered to produce much exculpatory evidence many months ago. The government did not provide the rental agreements. Nor did it produce them when this court entered an order requiring that any remaining exculpatory evidence be disclosed by January 10, 2000.
 

 As I explained earlier, Local Rules 116.8 and 116.9 require the preservation of contemporaneous notes and other records by all other agencies involved in investigation, including state, and local law enforcement agencies involved in an investigation. They require the United States Attorney’s Office to advise agencies and agents of this obligation.
 
 See
 
 Local Rule 116.8.
 

 The Local Rules were adopted on September 8, 1998, after a several year period of development that involved work by a committee that included the United States Attorney and his designees, as well as representatives of the defense bar and federal judicial officers. It is a committee which I chaired.
 

 Although the Local Rules were adopted on September 8, 1998, they were made
 
 *147
 
 effective on December 1, 1998 in order to provide prosecutors and defense counsel an opportunity to become educated to their requirements, and for judicial officers to study them as well. There was, as part of that effort, a seminar on November 16, 1998, in which members of the District Court, the United States Attorney’s Office, and the defense bar participated.
 

 According to the affidavit filed by United States Attorney Donald Stern, pursuant to my January 20, 2000 Order, the United States Attorney tried to instruct Assistant United States Attorneys regarding the new Local Rules. The United States Attorney did not generally advise federal law enforcement agencies of the requirements of the new Local Rules, including the requirement that notes not be destroyed. He relied on Assistant United States Attorneys to educate investigators in the context of particular cases.
 

 There is an inherent and foreseeable risk in relying, as Mr. Stern did, on Assistant United States Attorneys to advise law enforcement agents of the government’s discovery obligations only in the context of specific cases. In many instances there is investigation conducted by a federal law enforcement agency, and often state and local counterparts working in conjunction with it, before an Assistant United States Attorney is consulted. That is part of the problem here, but not the main part of the problem.
 

 In 1999, the United States Attorney also provided further training concerning the Local Rules for members of his office generally and particular training for Assistant United States Attorneys who came to the office that year. There was, therefore, an effort made to communicate to Assistant United States Attorneys the requirements of the Local Rules which, as I said earlier, essentially clarify and codify preexisting constitutional and statutory obligations. However, it is clear from this case that the message sent to Assistant United States Attorneys was not received.
 

 As indicated earlier, Mr. Feeley is the supervisor of the Major Crimes Unit. It used to be called the General Crimes Unit. Every case is important, but cases in the Major Crimes Unit tend to be simpler than those in most other units of the United States Attorney’s Office. The Major Crimes Unit is the unit to which new Assistants, who do not have experience in criminal matters, are often assigned to get both training and experience.
 

 Two new Assistants worked on this case with, or under the supervision of, Mr. Fee-ley. They are Assistant United States Attorney Dena Sacco and Assistant United States Attorney Gregory Moffatt. However, in the course of this case, neither Mr. Feeley, Mr. Moffatt, nor Ms. Sacco advised the Secret Service agents or members of the Fall River Police Department conducting the investigation of their obligation to preserve their notes. Nor did the Assistant United States Attorneys discharge their obligation, codified by Local Rule 116.8, to obtain information from the Fall River Police Department and review it to determine if any of it was discoverable.
 

 Mr. Weare destroyed his notes. With one exception, the Fall River police officers who participated in the investigation also destroyed their notes. From the notes, Mr. Weare prepared written reports, which were introduced as Exhibits 7 and 8 on January 20, 2000. As indicated earlier, I find that not all of the information that was in Mr. Weare’s notes was incorporated in his report, despite his testimony to the contrary. Mr. Weare did not put all of the information contained in Fall River Police Officer Forcier’s notes in the report Mr. Weare prepared. He did put some information in his report that was not in Mr. Forcier’s notes.
 

 I find that the information in Mr. Weare’s notes that have been improperly destroyed may have been helpful to the defendant and was not included in the report. Mr. Weare withheld key documents helpful to the defendant from the prosecutors and the defendant. Those are
 
 *148
 
 the rental agreements that were Exhibits 1, 2, and 3. This provides good reason to believe that he kept other information helpful to defendant out of his report. The government has not persuaded me that he did not. Similarly, I am not persuaded that there was not information helpful to the defendant in the Fall River Police Department notes that were destroyed. Essentially, the government has not proven to my satisfaction that the violations of the rules constituted harmless errors.
 
 See Goldberg,
 
 425 U.S. at 111, n. 21, 96 S.Ct. 1338;
 
 Del Toro Soto,
 
 728 F.2d at 48.
 

 As described earlier, time is of the essence in this case. The defendant is prejudiced by not having the notes and by the late disclosure of Exhibits 1, 2, and 3. As I said earlier, Exhibits 1, 2, and 3 would reasonably prompt investigation that would be very helpful to the defendant if witnesses could be located who would testify that he is the person who signed Exhibits 1 and 2. However, there is not an opportunity for defense counsel to conduct that investigation in this case, which is only going to last about three more days.
 

 The Local Rules were specifically designed to prevent defense counsel from being placed in this predicament. The timing of the disclosure of exculpatory information was a major subject of discussion in the development of the new Local Rules. However, a primary purpose of the Rules has now been frustrated in a case indicted relatively soon after the adoption of the new Local Rules.
 

 As I said, the defendant is also prejudiced by his continuing detention, which may go beyond what his sentence would be if he were convicted — a highly uncertain issue.
 

 In addition, the misconduct by the government in this case is not an isolated instance. As indicated earlier, some of the history leading up to the new. Local Rules was described by Judge Woodlock in
 
 Man-narino,
 
 850 F.Supp. at 71-2. Since this matter really only arose yesterday, and we did not get out of court until 6:00 p.m., I have not had an opportunity to study the caselaw, even the reported caselaw, since 1994. Frequently, these issues arise, but do not result in reported decisions. However, I believe there is at least one case before the First Circuit now,
 
 United States v. Dumas,
 
 Cr. No. 94-10119-DPW, involving the shredding of notes, that presents a recent, similar issue.
 

 Moreover, I know that in my own few cases in the past several years there have been repeated instances of government misconduct, some of which bear a disturbing resemblance to the conduct in this case. I described one such instance on pages 24 through 25 and 282 through 285 of the September 15, 1999 decision I rendered in the
 
 United States v. Salemme.
 

 [1]
 

 In June 1997, I ordered the United States Attorney to produce certain evidence that should have prompted the production in July 1997, to the defendants in the
 
 Sa-lemme
 
 case documents that the United States Attorney’s Office had relating to an individual named Raymond Slinger. Those documents were not even brought to my attention for
 
 in camera
 
 inspection until May 1998. They were disclosed to me with a motion for a protective order that was based in part on the government’s contention that while Mr. Slinger said that he was interviewed by FBI agents about his allegation that James “Whitey” Bulger, among others, had put a gun to his head and threatened to kill him, the United States government, particularly the FBI, could find no interview report or FBI agent who had conducted that interview. Thus, the government argued that the evidence relating to Mr. Slinger should not be disclosed to defendants because it could not be shown he had ever been interviewed by the FBI. That argument
 
 *149
 
 quickly proved to be frivolous when it took defense counsel and me two minutes to find an FBI Special Agent, John Newton, who was standing in the hallway, who had interviewed Mr. Slinger. Mr. Newton then provided evidence that was very damaging and embarrassing to the government.
 

 In addition, as I described on pages 18 and 173 to 174 of the
 
 Salemme
 
 decision, the FBI violated my Orders by not producing documents in the personal possession of Special Agent in Charge Barry Mawn and his Assistant Mike Wolf, relating to the murders of Roger Wheeler, Brian Haloran, and John Callahan in time for key witnesses, Paul Rico and John Morris, to be questioned about them.
 

 Similarly, also in violation of my Orders, the government did not produce in a timely manner documents in the possession of the FBI concerning John Mclnytre.
 
 See Salemme
 
 at 175, 179. Ultimately, because of persistence by counsel for Flemmi’s co-defendants and some tenacity by me, they were produced. They were produced too late, however, to be used to question the relevant witness, former FBI Special Agent Roderick Kennedy, regarding circumstances relating to the disappearance of Mr. McIntyre.
 

 Perhaps, as I said in my decision, neither Mr. Flemmi nor the FBI wanted the McIntyre matter developed in those proceedings.
 
 Id.
 
 However, I note that media has reported within the past week that it appears that Mr. McIntyre’s body has been found as a result information provided by an alleged associate of Mr. Bulger’s and Mr. Flemmi’s. S. Murphy & J. Ellement, “Search is Tied to Alleged Mob Hits,”
 
 The Boston Globe,
 
 Jan. 14, 2000; A. Estes & J. Wells, “Cops Dig for Bodies of Mob Victims: Source: Bones Found at ‘Dumping Ground,’”
 
 The Boston Herald,
 
 Jan. 14, 2000.
 

 There are also other types of misconduct that have been regularly occurring. Sometimes they are explained, but the government admits not excused, by poor communication between the United States Attorney’s Office and the federal investigative agencies.
 

 For example, in
 
 United States v. Robert Williams,
 
 Cr. No. 98-10386, I conducted a hearing on a motion to suppress. In that hearing, an agent of the Internal Revenue Service (the “IRS”), James Wallwork, and an agent of the Drug Enforcement Agency (the “DEA”), Thomas Millar, testified. The IRS agent later essentially acknowledged that he fabricated much of his testimony concerning the purported reasons that he seized certain documents, which he admitted, after being caught in his lie by defense counsel, that he did not personally seize.
 
 United States v. Williams,
 
 Cr. No. 98-10386-MLW (Nov. 22, 1999 Tr. at 116-89). I have not had an opportunity to write a decision on that matter because the government and the defendant promptly entered into a plea agreement. However, the government does not dispute that the IRS agent testified falsely. William Sinnott, the Assistant United States Attorney in
 
 Williams,
 
 who was also the Assistant United States Attorney in
 
 Mannarino,
 
 stated that the government was disturbed by the revelations in the
 
 Williams
 
 case and was taking steps to assure that the problems did not occur again.
 
 Williams,
 
 Dec. 22, 1999 Tr. at 7. I believe he was sincere. I also believe Mr. Feeley’s apology today for the problems that arose in this case is sincere. However, apologies do not seem to prevent the recurrence of problems.
 

 For example, Mr. Feeley is fully familiar with
 
 United States v. Restrepo,
 
 59 F.Supp. 2d 133 (D.Mass.1999), and its progeny, which resulted in the dismissal by me of a series of cases alleging illegal reentry by deported aliens because the Immigration and Naturalization Service was regularly violating their rights under the Speedy Trial Act. Mr. Feeley was originally misled by the Immigration and Naturalization Service about its practice and, therefore, unwittingly materially misrepre
 
 *150
 
 sented those practices to the court.
 
 See Restrepo,
 
 59 F.Supp.2d at 135-36;
 
 United States v. Pena,
 
 73 F.Supp.2d 56, 57-8 (D.Mass.1999). Mr. Feeley revealed the misrepresentation to the court when he learned of it in responding to another meritorious motion to dismiss in a subsequent case similar to
 
 Restrepo. See Pena,
 
 73 F.Supp.2d at 57-8.
 

 Thus, what has happened in the instant case is not an isolated occurrence.
 

 Therefore, I am dismissing this case, although without prejudice, because the government has not proven the defendant has not been prejudiced by the failure to review and produce notes of the Secret Service and the Fall River Police Department, and the government has not proven that the defendant has not been prejudiced by the very late disclosure of the rental agreements that are Exhibits 1, 2, and 3. Rather, I find the defendant has been prejudiced.
 

 Because I find this prejudice, I am not dismissing this case solely as an exercise of the court’s supervisory powers. However, this is the classic case for dismissal as an exercise of supervisory powers.
 
 See United States v. Hasting,
 
 461 U.S. 499, 505, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983);
 
 United States v. Morrison,
 
 449 U.S. 361, 365, n. 2, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981);
 
 United States v. Santana,
 
 6 F.3d 1, 9-10 (1st Cir.1993).
 

 I know that supervisory powers must be exercised sparingly.
 
 Santana,
 
 6 F.3d at 10. Indeed, they are almost never used to dismiss a case.
 
 Id.
 
 at 11. Despite the litany of disturbing discovery abuses I have experienced, I have never dismissed a case on this basis, and Judge Woodlock did not dismiss
 
 Mannarino.
 

 However, in the instant case there is an acknowledged violation of the Local Rules. There is no dispute about that. I am not persuaded that defendant has not been substantially prejudiced.
 

 In addition, although there seems to be a dearth of indignation these days, this is “outrageous.” The United States District Court for the District of Massachusetts, in consultation with the United States Attorney’s Office and the defense bar, labored for several years to develop rules that would be fair and effective. We engaged in training. The judges of this District Court expect the Local Rules to be obeyed. Mr. Feeley is an experienced prosecutor and as the supervisor of the Major Crimes Unit is given special responsibility to train new Assistants. Yet in this case he did not obey the Local Rules himself, and he did not educate his Assistants to understand that they must do so. It was not his responsibility exclusively, because the Assistants were given training, and they were given manuals. However, it is just not that hard for a government lawyer who is really trying to understand the clear commands of the Local Rules and the constitutional requirements that they largely codify.
 

 However, it appears that despite the efforts of the United States Attorney and some of his senior subordinates the message sent has not been received by Assistant United States Attorneys. Thus, a historic pattern of misconduct has been perpetuated.
 

 Perhaps I should have dismissed this case with prejudice to try to send a stronger message. However, no lesser sanction than dismissal without prejudice is adequate.
 

 I am sure the immediate reaction of the United States Attorney to this decision will be disappointment and distress. However, on reflection, perhaps Mr. Stern and Mr. Feeley will think this dismissal is a healthy event because every member of this District Court is serious about observance of the Local Rules. They are fundamental to our effort to administer justice fairly and efficiently. If the requirements of the Local Rules have been overlooked in this case, it is very likely that they have also been overlooked in other cases. As I said earlier, the dismissal of this case does not put an allegedly dangerous person back on the streets. I hope that this dismissal will
 
 *151
 
 alert prosecutors to their responsibilities and thus prevent the dismissal of cases against more dangerous individuals in the future.
 

 Therefore, perhaps on reflection this decision will prove to be welcomed by the prosecutors. The Assistant United States Attorneys are on the front line. After the United States Attorney advises the federal investigative agencies of the requirements of the Local Rules, as he should, it is the Assistants who have to be relied upon primarily to assure that they are obeyed. It is, therefore, vital that those Assistants be sensitive to their responsibilities and discharge them properly.
 

 The dismissal is without prejudice. I have not had the jury sworn. Thus, although I am not the ultimate arbiter, there may not be a double jeopardy to bar the defendant’s reindictment.
 
 See Crist v. L.R. Bretz,
 
 437 U.S. 28, 38, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978) (“jeopardy attaches when the jury is empaneled and sworn”). This dismissal will, however, provide the government an opportunity to reflect on whether it really thinks that it is in the public interest to devote more resources to prosecuting Boubacar Diabate.
 

 Accordingly, for the foregoing reasons, this case is hereby DISMISSED without prejudice.
 

 [1]
 

 . The pages cited are those in the version of the
 
 Salemme
 
 decision which includes clerical corrections made on December 23, 1999 and may, therefore, differ by one page from the original version.